**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| MERCY AMBAT,<br>*Plaintiff*,<br><br>and<br><br>ZAINABU ANDERSON; SHARON CASTILLO; JOANNA CROTTY; PATTI FLYNN; TERESA FOX; LISA JANSSEN; RICHARD LEE; GLORIA MARTIN; ANTHONY PEPPERS; MATTIE SPIRES-MORGAN; YVETTE WILLIAMS; ROLAND ZANIE; PAMELA WALKER; GWENDOLYN HARVEY-NOTO; JENNIFER KEETON; OLGA KINCADE; EMIKO THEODORIDIS; MARTHA ORTEGA,<br>*Plaintiffs-Appellants*,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO,<br>*Defendant-Appellee*. | No. 11-16746<br><br>D.C. No.<br>3:07-cv-03622-SI |
| MERCY AMBAT,<br>*Plaintiff*,<br><br>and | No. 11-16752<br><br>D.C. No.<br>3:07-cv-03622-SI |

JON GRAY,

*Plaintiff-Appellant*,

v.

CITY AND COUNTY OF SAN FRANCISCO,

*Defendant-Appellee.*

---

MERCY AMBAT,

*Plaintiff*,

and

ZAINABU ANDERSON; SHARON CASTILLO; JOANNA CROTTY; PATTI FLYNN; TERESA FOX; LISA JANSSEN; RICHARD LEE; GLORIA MARTIN; ANTHONY PEPPERS; MATTIE SPIRES-MORGAN; YVETTE WILLIAMS; ROLAND ZANIE; PAMELA WALKER; GWENDOLYN HARVEY-NOTO; JENNIFER KEETON; OLGA KINCADE; EMIKO THEODORIDIS; MARTHA ORTEGA,

*Plaintiffs-Appellants*,

v.

CITY AND COUNTY OF SAN FRANCISCO,

*Defendant-Appellee.*

No. 11-17330

D.C. No.
3:07-cv-03622-SI

OPINION

Appeal from the United States District Court
for the Northern District of California
Susan Illston, Senior District Judge, Presiding

Argued and Submitted
December 4, 2013—San Francisco, California

Filed July 2, 2014

Before: Stephen S. Trott, Sidney R. Thomas,
and Mary H. Murguia, Circuit Judges.

Opinion by Judge Murguia

## SUMMARY[*]

### Employment Discrimination

The panel affirmed in part, reversed in part, and vacated in part the district court's judgment in favor of the City and County of San Francisco, and dismissed plaintiffs' appeal in part, in a Title VII case in which deputies of the San Francisco Sheriff's Department challenged a policy prohibiting male deputies from supervising female inmates in the housing units of the Sheriff's Department's jails.

The panel reversed the district court's grant of summary judgment to the County on sex discrimination claims and derivative claims and vacated the denial of summary

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

judgment to plaintiffs on those claims. The panel held that the County was unable to bear its burden of demonstrating that there was no genuine issue of material fact as to whether it was entitled to a "bona fide occupational qualification" defense. The panel concluded that there were genuine issues of material fact as to whether a reasoned decision-making process, based on available information and experience, led to the Sheriff's adoption of the policy, such that it would be entitled to deference. There were also genuine issues of material fact as to whether excluding male deputies because of their sex was a legitimate substitute for excluding them because they were actually unfit to serve in the female housing pods.

The panel dismissed plaintiffs' appeal from various evidentiary rulings because, in light of the panel's reversal of the district court's grant of summary judgment, plaintiffs could not establish prejudice.

The panel affirmed the district court's award of attorney's fees as to settled claims.

The panel affirmed the district court's grant of summary judgment on one plaintiff's retaliation claims.

---

## COUNSEL

Lawrence D. Murray (argued) and Robert C. Strickland, Murray & Associates, San Francisco, California, for Plaintiffs-Appellants Mercy Ambat, et al.

Daniel H. Bromberg (argued) and Timothy A. Butler, Quinn Emanuel Urquhart & Sullivan, LLP, Redwood Shores, California, for Plaintiff-Appellant John Gray.

Dennis J. Herrera, City Attorney; Elizabeth S. Salveson, Chief Labor Attorney; and Rafal Ofierski, Deputy City Attorney (argued), San Francisco, California, for Defendant-Appellee.

## OPINION

MURGUIA, Circuit Judge:

Plaintiffs, current and former deputies of the San Francisco Sheriff's Department ("SFSD"), appeal the district court's order granting summary judgment to the City and County of San Francisco (the "County") on their challenge to SFSD's policy prohibiting male deputies from supervising female inmates in the housing units of SFSD's jails. The district court concluded that SFSD's policy did not violate Title VII's prohibition on sex discrimination because it fell within the statute's "bona fide occupational qualification" exception, 42 U.S.C. § 2000e-2(e)(1). We reverse the district court's grant of summary judgment to the County on the sex discrimination claims and vacate the denial of summary judgment to plaintiffs on those claims.

## I. Facts and Procedural History

In October 2006, SFSD implemented a new policy prohibiting male deputies from supervising female inmates in the housing units of the jails operated by the County (the "Policy"). Single-sex staffing policies in correctional

facilities are not new, and we have considered before whether such polices violate Title VII by impermissibly discriminating on the basis of sex. *See Breiner v. Nevada Dep't of Corr.*, 610 F.3d 1202 (9th Cir. 2010) (holding policy violated Title VII); *Robino v. Iranon*, 145 F.3d 1109 (9th Cir. 1998) (per curiam) (holding policy did not violate Title VII).

The adoption of the Policy coincided with SFSD's plan to consolidate all of its female inmates within a single facility, County Jail 8 ("CJ8"). CJ8 has a "direct supervision" design, meaning that its housing units, or "pods," are composed of cells or sleeping bays arrayed around a central congregation space. Each pod has two tiers and between 56 and 88 beds. At the center of the pod is a podium from which a deputy can see into common areas and into the cells and sleeping bays. Each pod is staffed by two deputies, one of whom remains at the podium while the other makes rounds. Female inmates fill some, but not all, of the available housing pods in CJ8. Even though CJ8 is not single-sex, all of its pods are single-sex. This is consistent with SFSD's long-standing practice of segregating female and male inmates.

Although housing pods are single-sex, CJ8's pod for inmates receiving medical or psychiatric care is not sex-segregated. Male deputies are not permitted under the Policy to work with female inmates in the housing pods; however, male deputies may be assigned to the mixed-sex medical pod or assigned to transport female inmates between CJ8 and other locations. Male deputies may also enter female housing pods in some circumstances, such as to assist with feeding female inmates.

According to San Francisco Sheriff Michael Hennessey (the "Sheriff"), who had held his position since 1980,[1] he adopted the Policy for four reasons: (1) to protect the safety of female inmates from sexual misconduct perpetrated by male deputies, (2) to maintain the security of the jail in the face of female inmates' ability to manipulate male deputies and of the deputies' fear of false allegations of sexual misconduct by the inmates, (3) to protect the privacy of female inmates, and (4) to promote the successful rehabilitation of female inmates.

Of the four reasons the Sheriff claims led him to enact the Policy, he identified protecting the safety of inmates from sexual misconduct as the most important. As the County pointed out, between 2001 and 2009, SFSD investigated twelve complaints of sexual misconduct or inappropriate sexual relationships between a male deputy and a female inmate. Ten of those incidents occurred before the Policy was implemented in 2006, and two occurred after. Notably, four of the twelve incidents occurred in 2005, the year immediately preceding the implementation of the Policy. SFSD sustained the allegations of misconduct and disciplined deputies in two of the incidents: a 2001 incident in which a male deputy had an inappropriate relationship with a female inmate with the intent to "cultivate a sexual relationship" and a 2007 incident, after the Policy had been adopted, in which a male deputy was present during a female inmate's strip search. Three additional investigations were followed by a deputy's resignation; these concerned inappropriate contact or sex acts. SFSD also faced lawsuits in 2000 and 2005 alleging that male deputies had engaged in unlawful sexual misconduct with female inmates.

---

[1] Sheriff Hennessey no longer holds this office.

With this concern for inmate safety in mind, the Sheriff asserts that he considered three responses, apart from enacting the Policy, to the problem of protecting female inmates from sexual misconduct: (1) implementing additional screening of male deputies to determine whether they were likely to engage in sexual misconduct with female inmates, (2) installing additional surveillance cameras to monitor activities in CJ8's housing pods, and (3) providing additional training to deputies. However, he claims to have rejected each of these alternatives as ineffective or unfeasible, so he proceeded to implement the Policy.

In July 2007, 35 deputies – a majority of whom were female – filed suit against the County, alleging that the policy constituted sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a), and the California Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code § 12940. Title VII and FEHA both make it "unlawful, with narrow exceptions, 'to fail or refuse to hire . . . any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex.'" *Breiner*, 610 F.3d at 1207 (quoting 42 U.S.C. § 2000e-2(a)(1)).[2] Plaintiffs claimed that the Policy directly caused them a variety of harms related to the conditions of their employment. For example, they claimed that staffing restrictions caused by the Policy resulted in loss of control over when overtime was available or required, loss of opportunities to develop career-enhancing experience, and loss of preferred shifts and regular days off

---

[2] Because FEHA is interpreted consistently with Title VII, *see Guz v. Bechtel Nat'l Inc.*, 8 P.3d 1089 (Cal. 2000), we conduct our analysis of both federal and state claims according to Title VII case law.

previously earned by seniority.  Plaintiffs made additional claims based on their sex discrimination claims: for unlawful employment restrictions under Title VII and FEHA and for failure to prevent a violation of FEHA.

In response, the County first argued that any harm suffered by plaintiffs as a result of the Policy was exceedingly minor, or *de minimis*, and so was not actionable.  Although it did not dispute that the Policy discriminates against deputies on the basis of sex, the County further argued that the discrimination that resulted from the Policy was permissible under the "bona fide occupational qualification" ("BFOQ") exception to Title VII and FEHA.  *See* 42 U.S.C. § 2000e-2(e)(1) ("[I]t shall not be . . . unlawful . . . for an employer to hire and employ employees . . . on the basis of . . . sex . . . in those certain instances where . . . sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise.").  Where courts have permitted sex-based staffing restrictions in corrections facilities, it has typically been because the courts concluded that sex was a BFOQ for the staff positions at issue.  *See, e.g.*, *Robino*, 145 F.3d at 1111; *Everson v. Mich. Dep't of Corr.*, 391 F.3d 737, 761 (6th Cir. 2004).

Both parties moved for summary judgment, and the district court ruled that the County was entitled to summary judgment on plaintiffs' discrimination claims because it had made out a valid BFOQ defense.  *See Ambat v. City of S.F.*, 693 F. Supp. 2d 1130, 1141 (N.D. Cal. 2010) ("*Ambat I*").  The district court "emphasiz[ed] that [it] is not charged with determining whether the Policy was the *best* means of addressing the problems the Sheriff and Undersheriff [Jan Dempsey] were seeking to remedy.  Rather, the [district court's] task is limited to determining whether the Sheriff's

actions were lawful." *Id*. at 1138-39. The district court also granted summary judgment to the County on plaintiffs' Title VII and FEHA claims that were derivative of their discrimination claims. *Id.* at 1142. Because it had granted the County's motion, the district court denied plaintiffs' motion for summary judgment on these claims. *Id.* at 1141.

## II. Title VII Claim

We review de novo the district court's grant of summary judgment to the County and denial of summary judgment to plaintiffs on their employment discrimination claims. *Guatay Christian Fellowship v. Cnty. of San Diego*, 670 F.3d 957, 970 (9th Cir. 2011). "In doing so we are governed by the same principles as the district court: whether, with the evidence viewed in the light most favorable to the non-moving party, there are no genuine issues of material fact, so that the moving party is entitled to a judgment as a matter of law." *San Diego Police Officers' Ass'n v. San Diego City Emp. Ret. Sys.*, 568 F.3d 725, 733 (9th Cir. 2009) (citing *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004)).

We reverse the district court's grant of summary judgment to the County on plaintiffs' sex discrimination claims and derivative claims. The County was not entitled to summary judgment because it was unable to bear its burden of demonstrating that there was no genuine issue of material fact as to whether it was entitled to a BFOQ defense. Because the district court's conclusion that the County was entitled to a BFOQ defense was also the basis for its denial of plaintiffs' motion for summary judgment, we also vacate the district court's denial of plaintiffs' motion.

## A.  *De Minimis* Harm

Because the district court concluded that the County was entitled to a BFOQ defense, it did not rule on whether the County was entitled to a *de minimis* harm defense.  We decline to rule on this defense in the first instance.

## B.  Bona Fide Occupational Qualification Defense

Although Title VII prohibits employment discrimination on the basis of sex in most instances, it permits discrimination where "sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of [the defendant's] particular business or enterprise."  42 U.S.C. § 2000e-2(e)(1); *see also* Cal. Gov. Code § 12940 (excepting discrimination "based upon a bona fide occupational qualification" from prohibition against employment discrimination).  For example, Title VII would not compel a producer to audition men for a female role in a film, because being female could be a BFOQ for playing that role.  *See* 29 C.F.R. § 1604.2(a)(2).

Nevertheless, "[t]he BFOQ defense is written narrowly, and [the Supreme Court] has read it narrowly."  *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 201 (1991) (citations omitted).  A BFOQ can be established only by "objective, verifiable requirements [that] concern job-related skills and aptitudes."  *Id.* at 201.

When the district court granted summary judgment to the County, it did so on the basis that being female was a BFOQ for supervising female inmates in CJ8.  In reaching its conclusion, the district court granted considerable deference

to the judgment of the Sheriff, who had asserted that the Policy was necessary to protect the safety of female inmates, the security of the jails, the privacy of female inmates, and the ability of female inmates to be rehabilitated. *Ambat I*, 693 F. Supp. 2d at 1135. Because protecting these interests was part of the normal operation of San Francisco's jails, and because the Sheriff had determined that it was reasonably necessary to keep men out of supervisory roles in female housing pods in order to protect these interests, the district court reasoned that the County had proven that being female was indeed a BFOQ under these limited circumstances. *Id*. at 1141.

Soon after the district court granted summary judgment, we considered a similar Title VII claim in *Breiner*. At issue there was a policy implemented by the Nevada Department of Corrections ("NDOC") that prohibited men from serving as correctional lieutenants in a women's prison. 610 F.3d at 1205. The policy was implemented in the wake of a scandal arising from the prison's "uninhibited sexual environment," which had resulted in a female inmate's becoming pregnant. *Id*. at 1204–05. The NDOC justified its policy on three bases: "(1) male correctional lieutenants are likely to condone sexual abuse by their male subordinates; (2) male correctional lieutenants are themselves likely to sexually abuse female inmates; and (3) female correctional lieutenants possess an 'instinct' that renders them less susceptible to manipulation by inmates and therefore better equipped to fill the correctional lieutenant role." *Id*. at 1211. We reversed the district court's grant of summary judgment to NDOC because

> NDOC ha[d] not met its burden of showing "a basis in fact" for concluding that all male correctional lieutenants would tolerate sexual

abuse by their subordinates; that all men in the correctional lieutenant role would themselves sexually abuse inmates; or that women, by virtue of their gender, can better understand the behavior of female inmates. Nor ha[d] it refuted the viability of alternatives that would achieve that goal without impeding male employees' promotional opportunities.

*Id.* at 1216 (quoting *Dothard v. Rawlinson*, 433 U.S. 321, 335 (1977)).

In reaching our decision, we employed a two-pronged test for whether an employer had met its burden of proving that sex was a BFOQ:

To justify discrimination under the BFOQ exception, an employer must "prove by a preponderance of the evidence: 1) that the job qualification justifying the discrimination is reasonably necessary to the essence of its business; and 2) that [sex] is a legitimate proxy for the qualification because (a) it has a substantial basis for believing that all or nearly all [men] lack the qualification, or . . . (b) it is impossible or highly impractical . . . to insure by individual testing that its employees will have the necessary qualifications for the job."

*Id*. at 1210 (alterations in original) (quoting *EEOC v. Boeing Co.*, 843 F.2d 1213, 1214 (9th Cir. 1988)).**[3]**

After "surveying . . . decisions applying the BFOQ exception in the prison context," we observed that "even in the unique context of prison employment, administrators seeking to justify a BFOQ must show 'a high correlation between sex and ability to perform job functions.'" *Id.* at 1211–13 (quoting *Johnson Controls*, 499 U.S. at 202). We also recognized that it would be impossible to prove a BFOQ defense without "demonstrat[ing] that . . . alternative approaches . . . are not viable." *Id*. at 1215.

In light of our decision in *Breiner*, plaintiffs moved for reconsideration of the district court's summary judgment rulings on their sex discrimination claims. The district court denied the motion, concluding that *Breiner* was factually distinguishable from this case and so did not compel a different result. *Ambat v. City of S.F.*, 2010 WL 3340549 at *3 (N.D. Cal. Aug. 25, 2010) ("*Ambat II*"). Although we agree that the facts in these two cases are not identical, we conclude that *Breiner* controls our decision here and provides the correct analytic framework for evaluating the County's motion for summary judgment. However, before we consider the justifications for the Policy that the County has advanced under our two-step BFOQ inquiry, we must first address the issue of the deference owed to the Sheriff's judgment in implementing the Policy.

---

**[3]** We initially adopted this test for the purpose of evaluating sex discrimination claims under Title VII in 1980. *See Harriss v. Pan Am. World Airways, Inc.*, 649 F.2d 670, 676 (9th Cir. 1980).

### 1.  Deference to the Sheriff's Judgment

"Judgments by prison administrators that 'are the product of a reasoned decision-making process, based on available information and experience,' are entitled to some deference." *Breiner*, 610 F.3d at 1212 n.6  (quoting *Robino*, 145 F.3d at 1110); *see also Henry v. Milwaukee Cnty.*, 539 F.3d 573, 580–81 (7th Cir. 2008) ("[T]he administrators of female correctional facilities . . . are entitled to substantial deference when fashioning policies to further the goals of the facility. . . [H]owever, . . . the discretion accorded to these individuals . . . is [not] effectively unlimited.  A defendant ultimately must introduce sufficient evidence to prove that the administrator's judgment . . . is 'the product of a reasoned decision-making process, based on available information and experience.'" (quoting *Torres v. Wisconsin Dep't of Health & Soc. Servs.*, 859 F.2d 1523, 1532 (7th Cir. 1988))).

Deference often plays a significant role in supporting a BFOQ defense in the corrections context, and we do not downplay the importance of respecting the judgment of the officials who are most knowledgeable about how best to address the challenges posed by a particular institution. Nevertheless, such deference is not automatic.  We require that such a judgment be the result of a "reasoned decision-making process, based on available information and experience," *Breiner*, 610 F.3d at 1214; otherwise, deference to that judgment cannot play a role in our BFOQ inquiry.

Here, the record demonstrates that there are genuine issues of material fact as to whether or not such a process led to the Sheriff's adoption of the Policy.  In support of SFSD's decision-making process, the Sheriff asserts that he discussed the Policy with Undersheriff Dempsey, the Chief of the

Custody Division, and jail commanders for "months."  He also claims to have consulted "incident reports of misconduct or alleged misconduct."  However, while the prevention of sexual misconduct was offered by the Sheriff as his primary reason for adopting the Policy, SFSD did not conduct any internal surveys or studies to determine the extent of that misconduct.  Neither the Sheriff nor Undersheriff Dempsey attempted to consult the deputies directly responsible for supervising the inmates in order to learn from their front-line experience.  Further, the Sheriff testified that he did not consult any outside sources – not even his counterparts in other jurisdictions who may have considered similar policies – with the exception that the Undersheriff communicated to him that she had contacted an uncertain number of other California sheriff's departments to ask about whether they had implemented similar policies.  The Sheriff also testified that he had read about incidents of sexual abuse in the Michigan prison system, but that he did not do so until after the Policy was implemented and that his reading "reinforced" rather than informed his decision to implement the Policy.

Determining whether a corrections official is entitled to deference is a fact-intensive and case-specific inquiry; accordingly, it is generally within the discretion of the district court to determine which factors are relevant.  The district court observed that it had "uncovered no case holding that a correctional official *must* undertake a particular type of study or consultation," *Ambat I*, 693 F. Supp. 2d at 1138 (emphasis in original), and we are not arriving at a contrary holding.  That is to say, we are not concluding that the decision-making process supporting a discriminatory policy needs to take any particular form.  However, it is significant that the extent of the Sheriff's efforts to ensure that his judgment was the result of available information and experience contrasts sharply

with the efforts undertaken by other officials implementing similar policies that have withstood Title VII challenges on BFOQ grounds. *See, e.g.*, *Robino*, 145 F.3d at 1111 ("To comply with an EEOC settlement, [corrections officials] conducted an extensive survey of post duties before determining which posts should be designated female-only."); *Everson*, 391 F.3d at 741–45 (describing how three studies were conducted, including one pursuant to a settlement with the DOJ); *cf. Torres*, 859 F.2d at 1531–32 (holding that prison officials were required to "innovate" in order to serve the rehabilitative interests of the female inmates, because empirical studies concerning the rehabilitation of female inmates "simply did not exist" at the time).

The district court appears to have granted the Sheriff's judgment deference based primarily on his substantial qualifications, rather than on the characteristics of the decision-making process itself.  This reasoning is not consistent with our precedent, which conditions deference on whether the decision-making process itself was reasoned and well-informed.  *See Breiner*, 610 F.3d at 1214; *Robino*, 145 F.3d at 1110.  While we need not decide precisely how "reasoned" the decision-making process must be, nor how much of the "available information and experience" a corrections official must consider before implementing a facially discriminatory policy, the record before us now clearly exhibits a genuine dispute over whether the Policy resulted from a "reasoned decision-making process, based on available information and experience." *Breiner*, 610 F.3d at 1214 (quoting *Robino*, 145 F.3d at 1110).  Considering the evidence in the record in the light most favorable to the plaintiffs, as we must on the County's motion for summary judgment, a trier of fact could conclude that the Sheriff's judgment was not preceded by a decision-making process that

was sufficiently reasoned in proportion to the seriousness of imposing the Policy. Similarly, a trier of fact could also conclude that the seriousness of imposing the Policy required the Sheriff to make a greater effort to avail himself of the information and experience readily available to him – such as by conducting relevant surveys or studies, as in *Robino* and *Everson*, or by consulting with officials in other jurisdictions who had considered or implemented policies like the one he ultimately implemented, as plaintiffs suggest.

Thus, because a trier of fact considering the evidence in the light most favorable to plaintiffs could conclude that the decision-making process was either insufficiently reasoned or insufficiently based on available information and experience, the County cannot meet its burden of showing that the Sheriff's judgment is entitled to deference as a matter of law, and the County may not rely on such deference in meeting its burden of showing that there are no genuine disputes of fact as to whether it can satisfy our two-step BFOQ inquiry.

### 2.    Job Qualifications Reasonably Necessary to the Essence of Operating San Francisco's Jails

Although deference to the Sheriff's judgment cannot play a role in our analysis, it is still necessary for us to consider each rationale that has been offered by the County in order to determine whether the County is able to satisfy our BFOQ inquiry based solely on the evidence in the record. We must consider each of the four rationales offered by the County in order to determine (1) whether any rationale suggests a job qualification reasonably necessary to the essence of operating SFSD's jails, and, if so, (2) whether sex is a legitimate proxy for determining whether a deputy actually has that qualification. *Breiner*, 610 F.3d at 1210.

In considering each of the County's rationales, the County easily meets its burden, as a matter of law, of demonstrating that there are job qualifications derived from the four justifications that are reasonably necessary to the essence of operating SFSD's jails.  Each of the four justifications that the Sheriff claims drove his decision to implement the Policy – protecting female inmates from sexual misconduct by male deputies, maintaining jail security, protecting inmate privacy, and preserving the ability of female inmates to rehabilitate – is essential to the operation of a corrections facility and has been recognized as justifying facially discriminatory policies in other contexts.  *See Dothard*, 433 U.S. at 335 (security); *Robino*, 145 F.3d at 1111 (safety, security, privacy, rehabilitation); *Everson*, 391 F.3d at 750 (safety, security, privacy, rehabilitation).

Based on these important rationales for the Policy, we have no difficulty in identifying four "job qualification[s] . . . reasonably necessary to the essence of" operating SFSD's jails, any of which would satisfy the first prong of our test. *Breiner*, 610 F.3d at 1210.   These qualifications corresponding to the four rationales are (1) not posing a threat to the safety of female inmates due to a likelihood of perpetrating sexual misconduct against them; (2) not posing a threat to jail security; (3) not posing a threat to female inmates' privacy; and (4) not posing a threat to female inmates' ability to rehabilitate.  We now consider each of these four qualifications under the second prong of our test to determine whether there is any genuine dispute of material fact as to whether being male is a "legitimate proxy" for any of them.

### 3. Whether Sex Is a Legitimate Proxy for Reasonably Necessary Job Qualifications

The County may show that excluding all male deputies is a "legitimate proxy" for excluding deputies who lack one of the four qualifications if there is (a) "a substantial basis for believing that all or nearly all [men] lack the qualification" or (b) "it is impossible or highly impractical . . . to insure by individual testing" whether or not a male deputy has the qualification. *Id.* at 1210 (alteration in original). We also note that it is impossible to satisfy the "legitimate proxy" prong if there is no "concrete, logical basis for concluding that gender restrictions are 'reasonably necessary,'" *id.* at 1212, or if alternatives have not been reasonably considered and refuted, *id.* at 1216.

The County asserts that the primary reason for the Sheriff's adoption of the Policy was to protect the safety of female inmates by reducing the possibility of sexual harassment and abuse by male deputies. While there is no question that this is an extremely important interest, the County has not met its burden of showing that there is no genuine dispute over whether excluding men from supervisory positions in female housing units is a legitimate proxy for requiring that deputies in those positions not pose a threat to the safety of female inmates. More specifically, at this stage of the proceeding, the County has not shown that the Sheriff had "a substantial basis for believing that all or nearly all" male deputies were likely to engage in sexual misconduct with female inmates, nor has it shown that "it is impossible or highly impractical . . . to insure by individual testing" that a male deputy does not pose such a threat. *Id.* at 1210.

The statistics on sexual misconduct perpetrated by male deputies against female inmates in SFSD's jails are deeply troubling. The record shows that in the five years preceding the implementation of the Policy, ten allegations of sexual misconduct were made; two more allegations were made the year after the Policy was implemented. A substantial portion of these allegations were sustained or were followed by a deputy's resignation. We also accept that it is reasonable to assume, as the County argues, that other instances of misconduct may have gone unreported.

Nevertheless, these statistics by themselves do not prove that "all or substantially all" male deputies are likely to perpetrate sexual misconduct. To suggest that all or most male deputies pose such a threat would amount to "the kind of unproven and invidious stereotype that Congress sought to eliminate from employment decisions when it enacted Title VII." *Breiner*, 610 F.3d at 1211.

On this record, the County is also unable to show that there is no genuine dispute as to whether it is impossible or highly impractical to insure by individual testing that a male deputy does not have a propensity to perpetrate sexual misconduct. We have observed that background checks, which all deputies must undergo, are among "prison administrators['] . . . multiple resources . . . to ensure compliance with institutional rules." *Breiner*, 610 F.3d at 1215. As the County points out, peace officer candidates must also undergo psychological examinations.

While conceding that background checks and psychological testing are used for the purpose of screening for a propensity to perpetrate sexual misconduct, the County suggests that such screening mechanisms are inadequate

because they are unable to detect *all* potential perpetrators. Removing every deputy with any potential for engaging in misconduct may be a laudable goal, but that goal is insufficient to justify a policy that discriminates in such broad strokes. Rather, we have observed that a BFOQ defense cannot be maintained if available testing offers "a practical reliable differentiation of the unqualified from the qualified applicant, [even if it is] not a perfect differentiation." *See E.E.O.C. v. L.A. Cnty.*, 706 F.2d 1039, 1040, 1043 (9th Cir. 1983) (internal citation and quotation marks omitted). The record before us does not resolve the genuine dispute over whether the tests that are presently used or that could be used by SFSD would permit it to make a practical reliable differentiation between those who are likely to engage in sexual misconduct and those who are not.

The County also argues that employing male deputies in the female housing pods poses a threat to jail security. In so arguing, it points to two specific assertions offered by the Sheriff. First, the Sheriff expressed concern that male deputies were particularly vulnerable to manipulation by female inmates, potentially leading them to overlook conduct in violation of jail regulations, such as smuggling contraband into the jail. Second, he claimed that the consequence of male deputies' fear of being accused of sexual misconduct could be that those deputies would be unwilling to supervise female inmates as closely as necessary, leading to an even greater risk of female inmates being able to violate jail rules.

However, the record on summary judgment is insufficient to demonstrate that there is no genuine dispute as to whether "all or substantially all" male deputies would be vulnerable to manipulation by female inmates or as to whether it would be "impossible or highly impractical" to test for whether a

male deputy is manipulable. The County has introduced no evidence, even in the declarations of SFSD officials, that would support this conclusion. Likewise, the County has failed to demonstrate that there is no genuine dispute over whether "all or substantially all" male deputies would be influenced by fear of false allegations, or over whether it would be "impossible or highly impractical" to test for such behavior. The Sheriff himself acknowledged that he has "no idea" how widespread this purported problem is. He also admitted that he is unaware of whether any efforts were made within SFSD to explore non-discriminatory alternatives to the Policy for the purpose of mitigating the potential effect of false allegations leveled at male deputies. Thus there is a genuine question as to whether the County is able to "refute[] the viability of [non-discriminatory] alternatives." *Breiner*, 610 F.3d at 1216.

The County's third justification for the Policy is protecting the privacy interests of female inmates. However, the record does not demonstrate that there is an actual risk of female inmates' privacy being compromised by male deputies. SFSD has policies in place to prevent male deputies from taking on duties, such as strip searches, that might violate the privacy of female inmates. The inmates are required to remain clothed at all times, except when showering. When showering or using the toilet, inmates' bodies are covered by a privacy screen.

The Sheriff claims that the use of privacy screens compromises jail security, but there is a genuine dispute as to whether privacy screens actually do compromise jail security where, as here, the screens remained in use even after the Policy was adopted. *See Torres*, 859 F.2d at 1526 (finding that a BFOQ defense could not be sustained over privacy

concerns where "the [district] court noted that [corrections officials] continued to allow [female] inmates to use privacy cards even after the BFOQ program [requiring female guards] had been installed, thus rebutting the argument that the presence of male guards reduced observation of the inmates").

The County's final justification for the Policy is promoting the rehabilitation of female inmates. The Sheriff asserts that he was concerned that surveillance by male deputies could traumatize female inmates, particularly those who had suffered physical or sexual abuse in the past. The County introduced evidence that a disproportionately high number of female inmates had suffered such abuse. Nevertheless, there is a genuine dispute over whether excluding male deputies is a legitimate proxy for excluding deputies who would interfere with female inmates' rehabilitation.

A "staffing restriction . . . must match . . . 'job functions' with a high degree of specificity to be found reasonably necessary." *Breiner*, 610 F.3d at 1213 (quoting *Johnson Controls*, 499 U.S. at 202). In this situation, SFSD has separated the functions of supervising the inmates in the housing pods from the functions of providing rehabilitative programming to the inmates, such as through a high school program, support groups, and parenting classes. Further, there is no evidence in the record that the individuals staffing the rehabilitative programs, some of which are staffed by independent contractors, are themselves required to be female. If female inmates were supervised by men in their rehabilitative programs while the Policy was in effect, that fact alone would defeat the County's argument that excluding men from supervisory roles was necessary to promote female

inmates' rehabilitation.  *See Henry*, 539 F.3d at 582-83 ("[I]nconsistencies in implementation cast a significant doubt on whether the policy is reasonably necessary.").  As plaintiffs observe, there is also conflicting expert testimony over whether isolating female inmates from men might in fact impede the inmates' efforts at rehabilitation; for example, plaintiffs' expert discussed research indicating that the presence of male officers might itself promote the rehabilitation of female inmates.

## C.  Conclusion

The justifications offered by the County in support of the Policy each speak to extremely important concerns, and the Sheriff is to be commended for his attention to the welfare of female inmates in San Francisco's jails.  However, the fact that the Policy seeks to advance such important goals as inmate safety is not, by itself, sufficient to permit discrimination on the basis of sex.  When moving for summary judgment, the County bears the heavy burden of showing that there are no genuine issues of material fact as to whether excluding male deputies because of their sex is a legitimate substitute for excluding them because they are actually unfit to serve in the female housing pods.  On the record before us, the County has not made such a showing.

Discrimination on the basis of sex is almost always disfavored under Title VII.  Thus, even in a correctional setting, our test for whether an employer is entitled to a BFOQ defense – that is, whether an employer has shown that discrimination is "reasonably necessary," 42 U.S.C. § 2000e-2(e)(1) – is purposefully difficult to satisfy.  It is even more difficult when an employer moves for summary judgment and so must show that there are no genuine disputes that would

prevent it from satisfying our two-step inquiry as a matter of law. While we do not reach the issue of whether the County could ultimately prevail on plaintiffs' discrimination claims, the factual disputes in this case prevent the County from prevailing at this stage.

We are mindful that deference often plays a significant role in allowing a defendant to meet its burden of proving that it is entitled to a BFOQ defense in the corrections context, and we do not downplay the importance of courts deferring to the judgment of officials like the Sheriff, who has tremendous experience and expertise with respect to all aspects of operating San Francisco's jails. But, again, such deference is not automatic, no matter how extensive an official's qualifications. A discriminatory employment policy is an extraordinary response to a workplace problem, and our principle of deferring to the judgments of corrections officials has its roots in the expectation that officials have made commensurate efforts to determine that a discriminatory policy is a necessary response and the only viable response. Thus, while we don't presume to be able to second-guess an official's judgment, we do require that such a judgment be "'the product of a reasoned decision-making process, based on available information and experience.'" *Breiner*, 610 F.3d at 1212 n.6 (quoting *Robino*, 145 F.3d at 1110).

We need not and do not reach a conclusion about whether the Sheriff's judgment was the result of such a reasoned process. However, on the record before us, we cannot find as matter of law that the Policy resulted from such a process. Therefore, on summary judgment, the County may not rely on deference to the Sheriff's judgment in order to meet its burden of proving that it was entitled to a BFOQ defense. In the absence of deference to the Sheriff's judgment, the

County is also unable to meet its burden of proving that there is no issue of material fact as to whether its policy of excluding all male deputies from the female housing units is a legitimate proxy for excluding only those deputies that truly pose a threat to the important interests SFSD rightfully seeks to protect. The district court's grant of summary judgment as to plaintiffs' sex discrimination claims and other claims predicated thereon is **REVERSED**.

Because the district court denied plaintiffs' summary judgment motion on the same grounds that it granted the County's motion, the district court's denial of summary judgment to plaintiffs on these same claims is **VACATED**. This case is **REMANDED** for further proceedings on these claims.

## III.    Evidentiary Claims

Prior to the district court's ruling on the parties' cross-motions for summary judgment on plaintiffs' discrimination claims, plaintiffs made numerous objections to evidence offered by the County in support of its motion – particularly to declarations submitted by SFSD officials. The district court overruled three of the objections; it did not explicitly rule on the remainder of the objections but relied on the challenged evidence in its summary judgment order. Plaintiffs challenge the district court's explicit and implicit evidentiary rulings in the County's favor.

"We review the district court's evidentiary decisions for abuse of discretion, and the appellant is . . . required to establish that the error was prejudicial." *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1110 (9th Cir. 2011) (internal quotation marks omitted). Because we reverse the district

court's grant of summary judgment on plaintiffs' discrimination claims, plaintiffs cannot establish prejudice; plaintiffs will have the opportunity to challenge the district court's evidentiary rulings if they are unsuccessful on remand. Plaintiffs' evidentiary challenges are **DISMISSED**.

## IV.    Attorney's Fees

In addition to their sex discrimination claims, plaintiffs filed various retaliation claims, also under Title VII and FEHA. The district court granted summary judgment to the County as to all but three plaintiffs, and the County settled the remaining claims. Plaintiffs moved for attorney's fees in the amount of $127,447.26 for having settled these claims. After an in camera review of plaintiffs' counsel's time sheets, the district court awarded $8,925 for "retaliation-specific work," observing that plaintiffs could not recover "fees for time devoted to litigating the gender discrimination claims." Plaintiffs contend on appeal that the fee award is not commensurate with the extent of their success.

"[I]n a lawsuit where the plaintiff presents different claims for relief that 'involve a common core of facts' or are based on 'related legal theories,' the district court should not attempt to divide the request for attorney's fees on a claim-by-claim basis. Instead, the court must . . . 'focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.'" *McCown v. City of Fontana*, 565 F.3d 1097, 1103 (9th Cir. 2008) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983)). In sum, "the district court should adequately explain the reasonable number of hours and hourly rate it uses in calculating the fee, and appropriately adjust the award to account for [a plaintiff's] limited success

on claims and damages, and for any public benefit derived from his suit." *Id*. at 1105.

The district court concluded that plaintiffs' success was minor relative to the scope of the sex discrimination action, and it awarded fees accordingly. Reviewing for abuse of discretion, *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1200 (9th Cir. 2002), we see no indication that the district court abused its discretion in making the award that it did. Under the district court's own reasoning, plaintiffs will be entitled to a substantially greater award if they are successful on remand. The district court's award of attorney's fees is **AFFIRMED**.

## V.  Gray's Retaliation Claims

John Gray was among the plaintiffs who claimed retaliation and against whom the district court granted summary judgment; the district court was correct in its judgment. Gray disseminated defamatory statements about several individuals, amounting to what the SFSD deemed "[c]onduct, on or off duty, which reflects adversely on the SFSD." As a result, he was terminated. Gray is unable to rebut the County's evidence that his conduct was the non-retaliatory motive for his termination, *Munoz v. Mabus*, 630 F.3d 856, 865 (9th Cir. 2010), nor can he "produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated" the County, *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004). Further, his argument that his defamatory statements, because they were made in connection with an earlier employment-related arbitration, are protected by California law from being used as evidence in this action is without merit. *See Oren Royal Oaks Venture v. Greenberg,*

*Bernhard, Weiss & Karma, Inc.*, 728 P.2d 1202, 1208 (Cal. 1986).  The district court's grant of summary judgment to the County on Gray's retaliation claims is **AFFIRMED**.

**AFFIRMED** in part, **REVERSED** in part, **VACATED** in part, **DISMISSED** in part, and **REMANDED** for further proceedings.  Each party shall bear its own costs.