**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TEAMSTERS LOCAL UNION NO. 117,
a Washington corporation,
*Plaintiff-Appellant*,

v.

WASHINGTON DEPARTMENT OF
CORRECTIONS,
*Defendant-Appellee*,

JANE DOE CLASS,
*Intervenor-Defendant–Appellee.*

No. 13-35331

D.C. No.
3:11-cv-05760-
BHS

OPINION

Appeal from the United States District Court
for the Western District of Washington
Benjamin H. Settle, District Judge, Presiding

Argued and Submitted
December 9, 2014—Seattle, Washington

Filed June 12, 2015

Before: Michael Daly Hawkins, M. Margaret McKeown,
and Richard C. Tallman, Circuit Judges.

Opinion by Judge McKeown

# SUMMARY[*]

## Labor Law

Affirming the district court's summary judgment, the panel held that the Washington Department of Corrections did not discriminate against male correctional officers on the basis of sex in violation of Title VII by designating a number of female-only correctional positions in women's prisons.

The panel denied the Department's motion to dismiss the appeal, holding that the record, as supplemented on appeal, established standing on the part of the correctional officers' union.

On the merits, the panel concluded that the Department's individualized, well-researched decision to designate discrete sex-based correctional officer categories was justified because sex was a bona-fide occupational qualification reasonably necessary to the normal operation of the women's prisons. The panel stated that the Department was well-justified in concluding that rampant abuse should not be an accepted part of prison life and taking steps to protect the welfare of female inmates under its care.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Spencer Nathan Thal (argued), General Counsel, and Daniel A. Swedlow, Senior Staff Attorney, Teamsters Local Union No. 117, Tukwila, Washington, for Plaintiff-Appellant.

Peter B. Gonick (argued), Robert W. Ferguson, Attorney General, Kara A. Larsen, Senior Counsel, and Ohad M. Lowy, Assistant Attorney General, Washington State Office of the Attorney General, Olympia, Washington, for Appellee.

Nicholas B. Straley (argued) and Melissa R. Lee, Columbia Legal Services, Seattle, Washington, for Intervenor-Defendants–Appellees.

## OPINION

McKEOWN, Circuit Judge:

For years, Washington faced problems common to a number of states in their women's prisons: sexual abuse and misconduct by prison guards, breaches of inmate privacy, and security gaps.   A primary driver, according to prison authorities, was the lack of female correctional officers to oversee female offenders and administer sensitive tasks, such as observing inmates showering and dressing and performing the pat (or "pat-down") and strip searches that are stitched into the fabric of day-to-day prison life.  After long wrestling with this gender gap, the state undertook a comprehensive assessment and ultimately designated a limited number of female-only correctional positions—specifically, 110 positions to patrol housing units, prison grounds, and work sites.  The prison guards' union, Teamsters Local No. 117

("Teamsters" or the "Union"), challenged this practice, though it acknowledges the legitimacy of 50 of the female-only designations.   This case juxtaposes the prison's penological interests against male correctional officers who claim the staffing policy discriminates against them on the basis of sex in violation of Title VII of the Civil Rights Act of 1964.  42 U.S.C. § 2000e.

We conclude that the Washington Department of Corrections' (the "Department" or the "state") individualized, well-researched decision to designate discrete sex-based correctional officer categories was justified because sex is a bona-fide occupational qualification ("BFOQ") for those positions.   The Union's thin evidentiary submissions—coupled with expert claims that were largely unsubstantiated or missed the point—failed to raise a material factual issue.   Indeed, the startling statement by one of the Union's experts underscores the legitimacy of the state's efforts to combat sexual abuse: "Sexual abuse is present in all areas of our society. . .[F]emale inmates must be taught as part of the rehabilitation process to deal with all abusive staff: males and females . . ."   The Department was well-justified in concluding that rampant abuse should not be an accepted part of prison life and taking steps to protect the welfare of inmates under its care.  We affirm the district court's grant of summary judgment in favor of the Department.

## BACKGROUND

The Department runs two women's prisons.   The Washington Corrections Center for Women in Gig Harbor has a capacity of 738 inmates, although it is often overcrowded.   That prison runs the gamut from minimum security facilities to housing for violent offenders and those

with mental health issues.  It also houses Washington's death row for female prisoners.  The second facility is Mission Creek Corrections Center for Women in Belfair, a smaller minimum-security prison that houses around 300 inmates.

For decades, men dominated the ranks of prison guards, though neither party has provided precise figures.  Facing a shortage of female guards in the late 1980s, state prison administrators began allowing male guards to perform random, clothed body searches—commonly known as pat searches—of the female inmates at Washington Corrections Center.  Female inmates challenged these cross-gender searches as unconstitutional.  The district court granted an injunction and halted the practice.  Sitting en banc, we affirmed, concluding that cross-gender body searches inflict unnecessary and wanton pain on female inmates, many of whom have suffered a history of sexual abuse before incarceration, and, therefore, violate the Eighth Amendment.[1] *Jordan v. Gardner*, 986 F.2d 1521, 1531 (9th Cir. 1993) (en banc).  Under both *Jordan* and a later-enacted Washington law, female correctional officers must perform all non-emergency pat searches of female inmates.  Wash. Rev. Code § 9.94A.631(2) (2012).

In the years following *Jordan*, the Department struggled with the challenges posed by having an overwhelmingly male workforce.  In 1998, it asked the Washington Human Rights Commission (the "Commission") for an opinion on proposed correctional assignments reserved exclusively for female

---

[1] Experts in the case noted that 85% of female offenders reported a pre-incarceration history of sexual abuse.  *Jordan*, 986 F.2d at 1525–26.

officers. The Commission did not favor the Department's approach at that time.**[2]**

In 2003, Congress passed the Prison Rape Elimination Act, which included findings that, based upon experts' conservative estimates, 13% of prisoners had been sexually assaulted while in prison. *See* 42 U.S.C. § 15601. The legislation also noted that many instances of abuse go unreported and prison personnel were inadequately trained to deal with these issues. *See id.* §§ 15601–09. Under the Act, the Department received a $1 million grant to hire two full-time employees to investigate sexual misconduct allegations in prisons.

In the years that followed, the Department fielded widespread allegations of sexual abuse in its women's prisons. State officials, for example, substantiated 46 instances of misconduct in a single two-and-a-half-year stretch. In the aftermath, in 2007, female inmates brought a class action in state court alleging misconduct at the Washington Corrections Center. The complaint detailed incidents where guards assaulted and fondled female inmates and forced them to perform oral sex and masturbate in the presence of male officers. Complaint, *Jane Doe v. Clarke*,

---

**[2]** The Human Rights Commission, established in 1949, is the administrative agency responsible for administering and enforcing the state's antidiscrimination laws. *See* Wash. Rev. Code § 49.60.120 (2007). The Commission's view is treated as an "advisory interpretative statement" under Washington Revised Code Section 34.05.010(8). Before adopting female-only guard positions, the Department requested opinion letters from the Commission. *Teamsters Local Union No. 117 v. State of Wash. Human Rights Comm'n*, 235 P.3d 858, 860 (Wash. Ct. App. 2010).

No. 07-2-01513-0, Dkt. No. 4 (Thurston Co. Super. Ct. July 31, 2007).

Within a week of the filing of that lawsuit, the Department hired a consultant to investigate sexual activity and misconduct.  After a four-month internal investigation, the consultant detailed the facts in a 240-plus-page report. The investigation included interviews with 72 "Jane Doe" inmates, who alleged that they faced sexual advances and harassment from prison guards.  Among the lurid details, male guards twice impregnated inmates and smuggled contraband in exchange for sexual favors.

The Department also hired two additional consultants to review prison practices.  Marianne McNabb, of the Social Research Institute based in Olympia, Washington, wrote:

> Cross-sex supervision is currently one of the most significant issues facing the administration of women's prisons.  Today in many states, over 50 percent of the custody force in prisons for women are men.  The fact that so many women in prison have experienced sexual abuse by men makes them different from male prisoners who do not share that history and therefore do not experience the same level of anxiety or violation as do women, when under the custody or supervision of an officer of the opposite sex.

McNabb noted that several jurisdictions, including Idaho and Michigan, "have established sex-specific posts in female institutions" in response to these dynamics.  Her report

concluded, "While this may seem to be a solution for many of the concerns identified, this practice is generally not fully understood or accepted by staff and has faced some legal challenges."

Donald Kelchner, superintendent of the Pennsylvania Department of Corrections, urged the Department to adopt a host of reforms, including guard assignments reserved specifically for women.    In particular, Kelchner recommended that the state ensure any double-staffed housing units have at least one female guard.  Kelchner concluded, "It is more desirable in an institution housing females to have a higher number of female staff, to work with and supervise the inmates."

Following the expert recommendations, the Department in January 2008 implemented an array of reforms to "reduce prison sexual assaults and related behavior."  Those efforts included aggressive recruitment of female prison guards; pre-hiring psychological testing; training programs to enhance "gender awareness"; and the installation of privacy curtains, security cameras, and restricted access entry cards.

Then, in May 2008, prison administrators again requested guidance from the Commission on the Department's proposed 110 female-only guard post assignments at the two prisons.  The Department submitted a tailored request for each post, explaining the job responsibilities and why the positions needed a female officer.   The state told the Commission that "[i]ncreasing the number of female staff will reduce the risk of sexual misconduct, reduce allegations of sexual misconduct, and protect male staff exposed to vulnerable situations" and unfounded complaints of abuse. The state also emphasized the privacy requirements of female

inmates and the operational need to have female officers on hand to perform necessary searches and other tasks. The requested staffing changes, according to the state, would "ensure the security of the prisons, safety of incarcerated offenders, and protection of the privacy and dignity of female offenders."

After touring the prisons, interviewing administrators, and collecting detailed documentation, the Commission in February 2009 approved the Department's request for all 110 positions. The Commission offered Teamsters the chance to provide input but none was forthcoming. The Commission determined that, with the then-existing staff makeup at the prisons, the state was "unable to ensure a proper balance between security considerations and the privacy rights of offenders" and that there were no reasonable alternatives to sex-based staffing.

The class action settled soon after. As part of the settlement agreement, the Department agreed to enforce a "zero tolerance" policy regarding sexual misconduct, not to rehire five male correctional officers accused of abuse, and to submit regular reports on staff misconduct in women's prisons. The settlement also included an undisclosed payout to abused prisoners. Stipulation and Proposed Order, *Jane Doe v. Clarke*, No. 07-2-01513-0, Dkt. No. 170 (Thurston Co. Super. Ct. Aug. 6, 2010).

The Department's reprieve from the courtroom did not last long. In September 2011, Teamsters, which represents some 6,000 state correctional workers, filed this federal lawsuit, alleging that the sex-based staffing policy

implemented in 2009 violates the civil rights of male prison guards.[3]

At the conclusion of discovery, the district court granted summary judgment for the state. *Teamsters Local Union No. 117 v. Wash. Dep't of Corr.*, No. C11-5760 BHS, 2013 WL 1412335 (W.D. Wash. Apr. 8, 2013). The district court first found that the Union had failed to demonstrate the type of "cognizable injury" required to trigger Title VII liability. The court noted that the record developed by Teamsters included only "hypothetical evidence" of the damages its members would face, thus entitling the state to summary judgment. *Id.* at *4. Alternatively, the district court also granted summary judgment for the state on the question of sex discrimination. As an initial matter, the district court ruled that judicial deference to state prison officials was warranted. *Id.* The court concluded that, although there may have been factual questions on whether female guards were needed inside the housing units to prevent sexual assaults, the staffing policy was justified as a BFOQ to protect the privacy of inmates for each job category. *Id.* at 5–9.

## ANALYSIS

## I.  STANDING

This case is a cautionary tale about the threshold importance of standing. The state argues, for the first time on

---

[3] Teamsters also represents female correctional officers. The Union asserts in its brief that the female-only correction positions result in "an increase in mandatory overtime" for female guards. The Union presented no evidence to support that contention. Our analysis therefore focuses on the male guards.

appeal, and after receiving Teamsters' opening brief, that the Union lacks standing because it produced no evidence that any of its members suffered concrete injury.  The issue is not, as Teamsters urges, whether the question was addressed by the district court; rather, as a jurisdictional matter, "a challenge to constitutional standing is one which we are required to consider" apart from whether it was argued or addressed below.  *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1085 (9th Cir. 2003) (internal quotation mark and citation omitted).

The standing inquiry is governed by the familiar elements of injury-in-fact, traceability, and redressability.   "To establish Article III standing, an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (internal quotation marks and citation omitted). For associational standing, Teamsters must show in addition that "its members would otherwise have standing to sue in their own right." *Associated Gen. Contractors of Am., San Diego Chapter v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013).  In other words, the Union "must show that a member suffers an injury-in-fact that is traceable to the defendant and likely to be redressed by a favorable decision." *Id.*

The complaint posited varied theories of injury: male guards were forced to transfer jobs and prisons; suffered lost earnings, including overtime pay; were laid off; and experienced "loss of status, diminished sense of self-worth, anxiety, emotional distress, embarrassment, humiliation, mental anguish, and other related damages."  Surprisingly, proof of these general allegations did not materialize as

evidence.  The Union's submissions on summary judgment are thin, at best, in terms of identifying one or more specific members who suffered injury.  Ironically, it is the testimony the Union elicited from the *state* that provides the strongest support for the Teamsters' constitutional standing. Throughout discovery, the state did not dispute the general allegations that its staffing policy resulted in the transfer of male guards and lost overtime opportunities.  While no evidence linked a specific officer with a discrete wage loss, Superintendent Doug Cole indicated that six male officers had been displaced from their regular shifts—mentioning two by name—and agreed with the Union's lawyer that, with respect to male correctional officers, the staffing changes would result in "some reduction in their overtime opportunity . . ."  Every male correctional officer who was displaced from his regular shift, however, was offered a position on a different shift.

As the state points out, when a challenge to standing is raised at summary judgment, a plaintiff organization must "submit competent evidence, not mere allegations, to demonstrate that at least one of its members had standing." *Associated General*, 713 F.3d at 1194.  This is a settled proposition, though curiously the state never moved for summary judgment on standing nor contested the Union's standing allegations.  Nonetheless, a party is not excused from establishing standing simply because the opposing party did not tumble to the issue until the appeals stage.  *See Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2006) ("The[] elements of standing must be supported in the same way as any other matter for which a plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.").

In response to the state's motion to dismiss on appeal, Teamsters moved to supplement the record with affidavits from five Union members and an administrator.  Why this evidence surfaced only on appeal is a mystery.  Ordinarily, we do not allow parties to supplement the record on appeal absent "extraordinary circumstances."  *United States v. Boulware*, 558 F.3d 971, 975–76 (9th Cir. 2009).  Here, however, we accept the affidavits for the limited purpose of confirming the job-related harms that the Department acknowledged in general terms during discovery.  Doing so is "in the interests of justice and efficiency," *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1170 (11th Cir. 2006) (internal citation omitted), since the hiring policy has been on the books since 2009 and has been the subject of multiple proceedings; a remand or dismissal on procedural grounds would merely prolong resolution of the underlying issues.  In the affidavits, male correctional officers assert that they have suffered precisely the types of harm that the state acknowledged in discovery—most importantly, lost overtime.

Although the Union hardly made a slam-dunk showing of prospective harm, the record as supplemented on appeal reflects the bare minimum necessary to satisfy the threshold requirement of standing.  The Department's motion to dismiss the appeal on standing grounds is denied.

## II. TITLE VII AND THE BONA FIDE OCCUPATIONAL QUALIFICATION

Title VII of the Civil Rights Act of 1964 prohibits employment practices that discriminate on the basis of race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2. Nevertheless, a facially discriminatory employment practice, such as the sex-based hiring practice we have here, may pass

legal muster if sex is a bona fide occupational qualification or BFOQ. That narrow exception—found in § 2000e-2(e)(1)—provides:

> [I]t shall not be an unlawful employment practice for an employer to hire and employ employees . . . on the basis of . . . sex . . . where . . . sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise.

The Supreme Court has emphasized that "[t]he BFOQ defense is written narrowly, and this Court has read it narrowly." *UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 201 (1991). The BFOQ defense applies to "special situations" where employment discrimination is based upon "objective, verifiable requirements" that "concern job-related skills and aptitudes." *Id.* An "occupational qualification" means a "qualification[] that affect[s] an employee's ability to do the job." *Id.*

Under our precedent, the BFOQ defense "may be invoked only when the *essence* of the business operation would be undermined by hiring individuals of both sexes." *Breiner v. Nev. Dep't of Corr.*, 610 F.3d 1202, 1210 (9th Cir. 2010) (emphasis in original) (internal quotation marks and citation omitted). To justify discrimination under the BFOQ exception, an employer must show, by a preponderance of the evidence, that: (1) the "job qualification justifying the discrimination is reasonably necessary to the essence of its business"; and (2) that "sex is a legitimate proxy for determining" whether a correctional officer has the necessary job qualifications. *Ambat v. City & Cty. of San Francisco*,

757 F.3d 1017, 1025 (9th Cir. 2014) (quoting *Breiner*, 610 F.3d at 1210).

In light of these demanding legal standards, BFOQs are few and far between.  In many industries, it is difficult to imagine any jobs that would qualify as BFOQs. However, the "unique context of prison employment," *id.* at 1028, is one area where courts have found sex-based classifications justified.  The Supreme Court directly addressed the prison environment in just one case, *Dothard v. Rawlinson*, 433 U.S. 321 (1977).  The Court held that, in the context of a maximum-security facility "where violence is the order of the day" and sex offenders were interspersed with other prisoners, a female guard's sex may "undermine her capacity to provide the security that is the essence of a correctional counselor's responsibility."  *Id.* at 335–36.  Referencing *Dothard*, the Court in *Johnson Controls* explained that "[s]ex discrimination was tolerated because sex was related to the guard's ability to do the job—maintaining prison security." 499 U.S. at 202.

When justified under the circumstances, we and other circuits similarly have upheld sex-based correctional officer assignments in women's prisons.  *See Robino v. Iranon*, 145 F.3d 1109, 1110 (9th Cir. 1998) (per curiam) (BFOQ designation of six correctional officer positions at Hawaii women's prison); *Everson v. Mich. Dep't of Corr.*, 391 F.3d 737, 749–50 (6th Cir. 2004) (BFOQ designation of 250 correctional officer positions at Michigan women's prisons); *Tharp v. Iowa Dep't of Corr.*, 68 F.3d 223, 224 (8th Cir. 1995) (BFOQ designation of all correctional officer positions in women's residential unit within a mixed-gender minimum security prison); *cf. Torres v. Wisc. Dep't of Health and Soc. Servs.*, 859 F.2d 1523, 1532 (7th Cir. 1988) (en banc) (noting

that prison officials are not required to provide "objective evidence, either from empirical studies or otherwise," and remanding the denial of a BFOQ designation for evaluation "on the basis of the totality of the circumstances contained in the entire record.").

Although limited gender discrimination may be permissible in the prison employment context, prison administrators do not get a free pass.  The Department must have an objective "basis in fact" for "its belief that gender discrimination is 'reasonably necessary'—not merely reasonable or convenient—to the normal operation of its business." *Everson*, 391 F.3d at 748 (citing *W. Air Lines, Inc. v. Criswell*, 472 U.S. 400, 414 (1985)).  This means prison administrators "seeking to justify a BFOQ must show a high correlation between sex and ability to perform job functions." *Breiner*, 610 F.3d at 1213 (internal quotation marks and citation omitted).   Speculation about gender roles is insufficient—the evidence must demonstrate that prison administrators had a "concrete, logical basis for concluding that gender restrictions are reasonably necessary" and that alternatives to sex discrimination have been "reasonably considered and refuted." *Ambat*, 757 F.3d at 1028 (internal quotation marks and citation omitted).

An additional significant factor is at play: deference to prison officials.  "Judgments by prison administrators that are the product of a reasoned decision-making process, based on available information and expertise, are entitled to some deference." *Breiner*, 610 F.3d at 1212 n.6 (internal quotation marks omitted); *see also Robino*, 145 F.3d at 1110 (holding that, where Hawaii prison administrators appointed a task force to review prison policies, their "professional judgment is entitled to deference").

Although we have not offered up a cookbook for a "reasoned decision-making process," cases that have invoked the deference principle point to undertakings that address systemic issues, consider outside views and data, and weigh reasonable alternatives.  *See Robino*, 145 F.3d at 1111 (deferring to Hawaii prison administrators who directed a "specially appointed task force" to study prison problems); *Everson*, 391 F.3d at 741–45 (deferring to Michigan prison administrators where they conducted three studies, one pursuant to a settlement with the Department of Justice).  To be sure, although studies and empirical data are indicia of a deliberative approach, we have emphasized that "the decision-making process supporting a discriminatory policy" need not "take any particular form."  *Ambat*, 757 F.3d at 1026.  Deference is a threshold legal determination.

The Department's exhaustive process fits well within the rubric of "reasoned decision making" and is entitled to deference.  After the *Jane Doe* prisoner class action was filed in 2007, the Department did not rush headlong into sex-based staffing.  Instead, it hired experts, consulted with other states, reviewed relevant caselaw, documented scores of sexual misconduct allegations and investigated many more, and sought advice from the Human Rights Commission.  Drawing on its decades of experience, the state did not view sex-based staffing as a panacea, instead proposing a package of reforms that included measures such as applicant psychological testing, sex-awareness training, and security cameras.

Teamsters argues that the Department implemented sex-based staffing "during a time of Departmental crisis" and in a "panic" that was little more than a "desperate attempt" to settle the state court class action.  The Union's characterization begs the question: If sordid details of sexual

abuse and constitutional violations do not inspire a "crisis" and feelings of "panic," then what does? The state shouldn't be demonized for kicking into gear to find a remedy for its long-running challenges. In any event, our inquiry does not turn on the subjective state of mind of the Department's leadership. The Department undertook a rigorous review of its staffing policies to address the issues raised in the report and the class action.

The Department's thorough, thoughtful approach stands in stark contrast to the sheriff in *Ambat*, who rejected out of hand alternatives to discrimination—such as pre-hiring screening, surveillance cameras, and training—and declined to order an internal investigation or hire outside consultants. *See* 757 F.3d at 1022, 1026. The sheriff did not consult deputies directly responsible for prisoner supervision or other jurisdictions with similar policies, and no internal review documented the extent of misconduct. *Id.*

*Ambat* instructs that "[d]etermining whether a corrections official is entitled to deference is a fact-intensive and case-specific inquiry" that is "generally within the discretion of the district court." *Id.* at 1026. The district court found that the Department's process merited deference, and we see no reason to conclude otherwise. Accordingly, we give "some deference," *Robino*, 145 F.3d at 1110, to Washington's prison administrators, although we remain mindful of the antidiscrimination mandate of Title VII.

## III.    THE PRISON POLICY AND BFOQ REQUIREMENTS

In 2009 the Department determined that designating 110 female-only guard positions at the two prisons would substantially improve prison security, protect the privacy of

female inmates, and prevent sexual assaults. Teamsters challenges approximately sixty of those positions, which fall into four general categories: medium- and high-security housing units (18 positions); programs and activities supervisors (3 positions); work crew supervisors (6 positions); and relief posts to replace female guards who are on breaks or absent from work (32 positions).[4]

The Union paints the Department staffing policy as "broad and overreaching"—a "blunderbuss approach to the issue." The record demonstrates the opposite. Instead of a blanket ban on male prison personnel, the Department crafted the staffing needs to fit each specific facility and guard post. It targeted only guard assignments that require direct, day-to-day interaction with inmates and entail sensitive job responsibilities such as conducting pat and strip searches and observing inmates while they shower and use the restroom.

As the Union's expert acknowledged, "[n]o remedy is perfect nor perfectly effective." We couldn't agree more. This reality underscores the rationale for deference to prison administrators and the hazard of nitpicking the state's thoughtful response to deep-rooted problems in its women's prisons.

---

[4] The Union acknowledges that the remaining 50 positions—such as guard assignments in minimum-security housing units and those on the graveyard shift, where repeated instances of sexual misconduct occurred—are properly designated as female-only.

**A. The Department's Policy Rationales Are Reasonably Necessary to the Essence of Prison Administration**

At issue on appeal is whether the state established as a matter of law that sex-based restrictions are "a bona fide occupational qualification reasonably necessary" to normal prison operations.  Under the well-worn standard of Federal Rule of Civil Procedure 56, we affirm the district court's grant of summary judgment because there is "no genuine dispute as to any material fact and the [state] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). Teamsters failed to produce "specific facts showing there is a genuine issue for trial" to survive summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e)).

Curiously, Teamsters did not offer specific testimony from its members, former guards, or others with actual knowledge of on-the-block operations at the prisons. Although Teamsters offered up the reports of two experts, in the end their testimony does not create a material factual issue.  For starters, the reports generally fail to address the specific posts at issue.  Instead, they rehash alternatives to sex-based staffing that were exhausted and rejected by prison administrators or serve up proposals without any evidence of efficacy or practicality.  Finally, the Union's experts opine on the interpretation of social science research that is not central to the state policy in any event.

Although the sexual assaults that spawned the *Jane Doe* class action permeate this lawsuit, the state did not justify its BFOQ positions solely as a means to prevent sexual assaults. Instead, it identified several intertwined reasons for

designating the female-only positions.  In the initial request to the Human Rights Commission, the Department cited the need to "enhance the security of the prisons, safety of staff and offenders, and to protect the privacy and dignity of female offenders."  The Commission, in turn, concluded that absent the BFOQ designations, the prison is "unable to ensure a proper balance between security considerations and privacy rights of offenders" and endorsed the female job assignments "for the explicit purpose of ensuring privacy rights of female offenders."

Not surprisingly, under our precedent all of these interrelated objectives go to the heart of prison operations.  In *Ambat*, we held that, as a matter of law, "protecting female inmates from sexual misconduct by male deputies, maintaining jail security, [and] protecting inmate privacy" were all reasonably necessary to the essence of prison administration.  757 F.3d at 1027–28.  The same holds true here.

Security, of course, is the paramount concern of prison administrators.  As the Supreme Court has noted: "The essence of a correctional counselor's job is to maintain prison security."  *Dothard*, 433 U.S. at 335; *see also Everson*, 391 F.3d at 753 ("Unquestionably, the security of the prisons relates to the essence of [prison business].").  That maxim is no less true today.  Security concerns are necessarily intertwined with prison programs and objectives.

Inmate privacy encompasses the inmate's "interest in not being viewed unclothed by members of the opposite sex"—an interest that "survives incarceration" despite prisoners' diminished privacy expectations.  *See Robino*, 145 F.3d at 1111.  In the same vein, inmates have a privacy interest in

having non-emergency strip and pat searches—a pervasive fact of prison life—performed by guards of the same sex. *See Jordan*, 986 F.2d at 1524; *Tharp*, 68 F.3d at 226.

Preventing sexual assaults is also a legitimate prison objective. First and foremost, prison administrators have a high interest in shielding inmates from abusive and inherently coercive encounters. Indeed, even allegations of sexual misconduct can destabilize prison life: they can breed mistrust and damage morale among officers and prisoners; drain prison resources; and undercut the effectiveness of male officers with the looming threat of a career-ending accusation. *See Robino*, 145 F.3d at 1111 (discussing damage to prison morale caused by allegations of male staff sexual misconduct); *Everson*, 391 F.3d at 753 ("[A]llegations of sexual abuse, whether true or not, create a 'poisoned atmosphere' that breeds misconduct on the part of inmates and guards.").

Amazingly, one of the Union's experts offered the following view:

> Female inmates cannot be shielded from the world in which we live. If they are to reintegrate into society, they have to be taught how to deal with abusive staff, male or female. They have to be taught what constitutes a healthy interaction and what does not. They cannot learn those skills if they are sheltered from contact with males in a position of authority. ¶ Sexual abuse is present in all areas of our society: in schools, (at all levels), business, government, military and families. Just as females have to be

> taught how to deal with those abuses in the larger society, female inmates must be taught as part of the rehabilitation process how to deal with all abusive staff: males and females, custody staff and civilian staff.

To state something so obvious we never imagined it would need to be written: we reject any suggestion that female prisoners would benefit from being subjected to abusive prison guards as "part of the rehabilitation process" so that they may better "reintegrate into society." *See, e.g.*, Prison Rape Elimination Act, 42 U.S.C. § 15601(11) ("Victims of prison rape suffer severe physical and psychological effects that hinder their ability to integrate into the community and maintain stable employment upon their release from prison.").

We have little difficulty holding that the state's reasons for adopting the BFOQ designations—improving security, protecting inmate privacy, and preventing sexual assaults—are each reasonably necessary to the essence of operating Washington's women's prisons. That conclusion does not end the analysis, however. The state also must demonstrate that sex is a "legitimate proxy" to achieve one or more of these goals, meaning that there is a "high correlation between sex and ability to perform job functions." *Breiner*, 610 F.3d at 1213 (quoting *Johnson Controls*, 499 U.S. at 202). In addition, the state must show that alternatives to the sex-based classification were "reasonably considered and refuted." *Ambat*, 757 F.3d at 1028.

Before addressing these remaining requirements in the context of specific positions, we consider Teamsters' overarching arguments that the staffing policy is based on

stereotypes and that the state failed to consider nondiscriminatory alternatives.

Teamsters argues at length that the state policy is based on an impermissible stereotype that male guards are more likely to commit sexual misconduct than their female counterparts. This stereotyping argument misses the mark. To begin, the Union acknowledged that the policy was adopted in the face of documented allegations of abuse.[5] The Department also did not rest on assumptions; it provided objective legal and operational justifications for why only women can perform particular job functions, like observing inmates unclothed and conducting non-emergency searches.

We also reject Teamsters' argument that the Department could simply have hired new executives or reconfigured prison layouts. As our discussion of the day-to-day realities of the positions at issue demonstrates, neither of those alternatives actually addresses the specific operational challenges of maintaining prison security, preserving inmates' privacy, and stopping abuse.

---

[5] Because the 2009 policy stemmed from a documented history of sexual misconduct in Washington prisons, this case is distinguishable from *Breiner*. There, Nevada prison officials designated as female-only three upper-management positions based on the assumption that men were "incapable of adequately supervising front line staff in female prisons." 610 F.3d at 1213. The record disclosed no evidence that anyone in upper-management had ever abused an inmate. *Id.* at 1214. Here, by contrast, the sex-based job assignments are all "front line" positions that require direct, day-to-day interaction with female inmates. Washington has substantiated dozens of instances of sexual abuse implicating every job category at issue in this lawsuit.

**B. Sex is an Objective, Verifiable Job Qualification for the Designated Positions**

We conclude that sex is an objective, verifiable job qualification for the posts designated as female-only by the Department and that the Department appropriately considered reasonable alternatives.

### 1. Housing Units

The staffing restriction with the "largest impact," according to the Union, involves 18 positions at the medium- and high-security housing units at Washington Corrections Center.[6]  The housing units have two guards on duty on each shift.  Unlike other states, the Department did not ban male guards entirely; rather, the staffing policy requires at least one female guard per shift, an approach recommended by one of the state's consultants.

In the housing units, correctional officers "must conduct pat and strip searches of female offenders entering and leaving the facility" as well as frequent random and suspicion-based searches within the housing units.  In the segregation and mental illness units, inmates are strip searched every time they enter or leave their cells.  Except in emergency circumstances, male guards cannot legally perform any of these searches. *Jordan*, 986 F.2d at 1523; *see also* Wash. Rev. Code § 9.94A.631(2).

---

[6] The Union concedes that positions in minimum-security housing units are properly designated female-only.  Because Mission Creek is a minimum-security facility, the housing-unit positions at that prison are not at issue here.

Beyond searches, officers in the housing units also "may encounter female offenders in varying states of undress while showering, toileting, and dressing." Guards must collect urine samples from inmates, and a failure to "observ[e] the offenders during the entire process of urinalysis collection significantly impacts the reliability of the test results . . ." According to the state, "[m]ale staff cannot observe female offenders when they are engaged in these activities."

Given these operational needs, there is no reasonable substitute for having female guards inside housings units, according to the Department. Notably, temporarily removing a female guard from another part of the prison to cover in a housing unit "creates a gap for dealing with privacy issues at the post vacated." At best, that solution fixes one problem but creates another.

The evidence Teamsters puts forward to counter the Department's justifications is entirely inapposite. One of its experts points out that sexual assault is not a severe problem in medium- and high-security housing because "as the level of security increases, the opportunity for sexual assault decreases." This may be true, but it fails to acknowledge that the staffing decisions were designed to protect inmate privacy, which is "essential to the operation of a corrections facility and has been recognized as justifying facially discriminatory policies in other contexts." *Ambat*, 757 F.3d at 1028. The Union's other expert quarrels with citations to social science regarding female inmates' privacy needs and matters relating to sexual relationships between inmates and guards. This testimony again fails to raise any genuine dispute of material fact as to the Department's reasoned determination that the realities of operating Washington's

women's prisons necessitate designating these specific positions as female-only.

## 2. Programs and Activities

Programs and activities officers directly supervise inmate activities such as educational and religious classes, gym, crafts, and visitation hours. During these programs and activities, inmates are searched at random and if suspected of hiding contraband. Guards must collect urine samples from inmates and at times relieve housing unit officers, which requires "room checks" where they may "encounter female offenders in varying states of undress. . . ." These guards also supervise visitation hours, after which 50% of inmates are pat searched and 50% are strip searched. To fulfill these job functions, the state designated three programs and activities positions as female-only.

The Union's proposed alternative to designating these positions as female-only is a return to the system employed for the last two decades: dispatching female officers as rovers—or "response and movement" guards, in prison lingo—who could be paged when needed for searches.[7] The Union offers no data, expert testimony, or other evidence to support the efficacy of this approach. Instead, undisputed evidence established that the rover system was rife with problems, to say the least. During this era, prison administrators "shuttle[d] women staff from location to location throughout the prisons to perform essential security

---

[7] Union expert Gladwin says the female-only designation of programs and activities posts is "arbitrary," because the programs and activities officer who supervises the bike program can be a male guard. That officer, however, is not required to perform searches.

procedures, leaving other areas of the prison without appropriate staffing." Wait times for searches lasted an hour or more. With female guards stretched thin, inmates went unsupervised showering, using the restroom, or dressing—raising security and safety risks. Superintendent Eldon Vail testified that, before the BFOQ positions were implemented, the prison functioned "in the broadest sense" but the shortage of female guards restricted the prison's ability to deploy unannounced, random pat searches, an important tool in preventing the flow of contraband.

In light of this checkered history, the Union's conclusory assertion that the Department successfully "managed [privacy and search] issues for at least two decades" rings hollow. *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("[C]onclusory, self-serving statements in appellate briefs . . . are insufficient to create a genuine issue of material fact."). We will not displace prison administrators' experience and expertise in favor of an alternative that boils down to the "same old, same old." *Cf. Torres*, 859 F.2d at 1529 ("[P]rison administrators always have been expected to innovate and experiment." (citing *Turner v. Safley*, 482 U.S. 78, 107 (1987) (prison administrators must be allowed "to adopt innovative solutions to the intractable problems of prison administration")).

### 3. Work Crews

Work crew officers escort groups of ten prisoners to off-site work locations and supervise their workdays. Searches are again part and parcel of the job—comprising 70% of day-to-day responsibilities. Strip searches are required each time an inmate leaves and reenters the prison grounds. Before the 2009 staffing policy, female officers had to be "pulled from

somewhere else in the facility" to conduct these searches, which can "creat[e] [] a staff shortage in another area of the facility" and pose "a potential security risk," according to the Human Rights Commission.  During the workday, officers also must accompany female inmates as they use the restroom.  The Department concluded that, because of these job responsibilities, it needed female officers alongside work crews.  The Department therefore designated six positions as female-only.

Nonetheless, with respect to work crews, the Union argues that the Department should merely station female guards at prison entry and exit points.  If the need for a search arises "while work is in progress, this would constitute an 'emergent' search which is not prohibited for a male officer as a matter of law, policy or contract."  The Union produced no evidence or legal support for its emergency-search proposal.  Even if the Department could disingenuously label every work-site search as an emergency, the state's interest is broader than merely avoiding illegal searches.  Having male officers conduct pat searches *under any non-emergency circumstances* is undesirable and harmful to prisoner privacy and security.

Staging female officers at entry and exit points also ignores the state's interest in preserving security during work assignments.  The record showed that at least two inmates escaped from public bathrooms while on work crews, when they were not watched by male guards and no female guards were on hand.  The Union does not explain, much less provide evidence for, how its alternative proposal would address concerns about on-the-job observation.

## 4.  Relief Posts

Officers in the 32 relief positions substitute for female guards in female-only positions when they have a regular day off, are on vacation, or are out sick.  The relief officers perform the job responsibilities described above in housing units and elsewhere.  As the Human Rights Commission put it, the relief positions "alleviate understaffing of female officers, because a BFOQ position needs to be relieved by a BFOQ position."  In other words, if only male officers are available to fill in for BFOQ positions, it undermines the documented need of making those positions female-only in the first place.

According to the Union, 32 relief positions is too many, so the issue "must be reserved for trial because the Court cannot assess whether the relief sought was excessive without conducting a careful analysis of all such positions."  To survive summary judgment, however, the Union "may not merely state that it will discredit the moving party's evidence at trial and proceed in the hope that something can be developed at trial in the way of evidence to support its claim." *T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  Argument without evidence is hollow rhetoric that cannot defeat summary judgment.

### CONCLUSION

We affirm the district court's grant of summary judgment for the state.  The Washington Department's creation of a narrow category of female-only job assignments is a "bona

fide occupational qualification reasonably necessary to the normal operation" of the women's prisons.[8]

**AFFIRMED**.

---

[8] In light of our holding that the positions are lawful BFOQs, we need not decide whether the district court correctly granted summary judgment on the alternative ground that the Union has not shown that any of its members suffered cognizable injury under Title VII.