*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

TOM NOWACKI and All Others Similarly Situated,

Plaintiffs-Appellants,

v

DEPARTMENT OF CORRECTIONS,

Defendant-Appellee.

UNPUBLISHED
September 21, 2023

No. 361201
Washtenaw Circuit Court
LC No. 11-000852-CD

Before: GLEICHER, C.J., and JANSEN and RICK, JJ.

PER CURIAM.

Sexual abuse perpetrated by male corrections officers (COs) on female inmates precipitated lengthy and costly litigation in federal and Michigan courts. Class action settlements reached in more than one case granted recovery and promised protection to Michigan's female prisoners. The settlements triggered the adoption of special job descriptions for many positions in Michigan's female-only prisons requiring that certain positions be filled only by female COs. These job descriptions are known as bona fide occupational qualifications (BFOQs). These BFOQs have been affirmed by Michigan and federal courts.

Circumstances have changed over time. Michigan now incarcerates all female prisoners in one prison. That prison includes both housing and nonhousing units. Tom Nowacki, on behalf of a class of male COs, filed suit to challenge BFOQs restricting the employment of male COs in many areas of the Women's Huron Valley Correctional Facility (WHV). As of this appeal, the challenges are limited to certain positions in nonhousing units, such as the cafeteria, gym, and classrooms.

The parties zealously battled over whether the Department of Corrections (DOC) met its steep burden of supporting the gender-based distinctions. The circuit court found that the DOC had met its burden, denied Nowacki's motions for partial summary disposition and directed verdict, and took judicial notice of the validity of the BFOQs at trial. The court also rejected Nowacki's motion for judgment notwithstanding the verdict (JNOV) after the jury found in the DOC's favor.

We discern no error and affirm.

-1-

## I. BACKGROUND

Before 2009, several lawsuits were brought against [the DOC] alleging that some of its staff were sexually abusing female prisoners. Settlement agreements were reached in these cases. In response [the DOC] sought, and the Michigan Civil Service Commission [MCSC] approved, the use of [BFOQs], which ensured that only women could be employed for certain positions at [WHV]. [*Nowacki v Dep't of Corrections*, unpublished per curiam opinion of the Court of Appeals, issued August 19, 2014 (Docket No. 315969) (*Nowacki I*), slip op at 1, lv den 498 Mich 859 (2015).]

The initial BFOQs applied to approximately 250 housing-unit positions in Michigan women's prisons. Once the DOC consolidated all female prisoners at WHV, it realized that certain newly created positions in nonhousing units carried the same risks of sexual impropriety. Specifically, some positions placed prisoners in isolated situations with guards, allowing guards to observe prisoners in a state of undress, or requiring them to conduct pat-down searches. In March 2009, DOC Operations Support Administrator Gary Manns requested permission of the MCSC to adopt additional BFOQs, stating:

If approved, this will result in the utilization of only female staff in positions with regular work assignments that affects the privacy and security of female prisoners. Custody and security duties include those that affect the privacy of female prisoners such as observance of showers, dressing and undressing, use of toilet facilities, and conducting multiple daily searches, including clothed body and unclothed strip searches. . . .

The mission of the []DOC is to provide a safe and secure environment, while respecting the privacy of prisoners, and to provide staffing which is consistent with the appropriate federal and state laws regarding equal employment opportunity. The []DOC has been involved with litigation involving alleged sexual misconduct between male staff and female prisoners and their privacy rights. This litigation, along with the []DOC's desire to maximize the safety and security of its staff and prisoners, has demonstrated the critical need to expand a limited number of BFOQ positions. Each of the identified positions is either an isolated position, involves potential privacy concerns on the part of the prisoners, or requires an officer to conduct pat-down searches on the female prisoners. Thus, each position touches on the []DOC's legitimate concerns of safety, security, and privacy.

The [DOC] has made a number of changes responding to allegations of inappropriate behavior and complaints regarding privacy of female prisoners. These include physical plant modification, policy, procedure, and employee handbook changes, improvements in staff training, staffing level increases, and improved prisoner education. Notwithstanding these changes, however, the [DOC] has determined that additional steps would further increase the safety and security of its staff and prisoners. The []DOC has reasonably concluded that the BFOQ positions would accomplish the issues at hand – the security of the prison, the safety of prisoners, and the protection of the privacy rights of prisoners.

Manns requested certain nonhousing-unit positions be designated as female-only, including in the industries building, healthcare and medical transport, classrooms, food service areas, the control center, property room, and prisoner intake. The MCSC approved these additional BFOQs.

Tom Nowacki filed suit in 2011, alleging that the DOC violated the Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq.*, by applying the BFOQs "over broadly, improperly denying him and other men opportunities for various job assignments and overtime work." *Id*. The circuit court certified a class action and this Court affirmed. *Id*.

Trial was a long time coming. Following this Court's affirmance of the class certification, the DOC "transferred the equitable and declaratory claims to the Court of Claims . . ., leaving the claims for monetary damages pending and stayed in the circuit court." *Nowacki v Dep't of Corrections*, 319 Mich App 144, 146; 900 NW2d 154 (2017) (*Nowacki II*). Nowacki voluntarily dismissed the equitable and declaratory counts to allow the monetary damages claims to proceed in the circuit court. *Id*. at 148. The DOC appealed the dismissal, but this Court affirmed in *Nowacki II*.

Shortly after *Nowacki II*, the DOC discontinued eight of the 11 challenged nonhousing-unit BFOQs. In notifying the MCSC of this change, DOC Human Resources Director Tony Lopez explained:

> [W]ith the continuing technological advances that have been made at [WHV] since the original approval for the BFOQs was granted, primarily the placement of over 1,300 cameras throughout the facility, monitoring of cameras and high capacity storage recorders, the [DOC] does not believe that some of the previously approved BFOQs remain necessary.

Once back in the circuit court, the parties filed countermotions for summary disposition under MCR 2.116(C)(10). The DOC asserted that the validity of the gender-based distinctions in the 2009 nonhousing-unit BFOQs had been established by the many judicial approvals of the housing-unit BFOQs. And the need for the new BFOQs was supported by the history of sexual abuse that lead to several lawsuits and settlement agreements involving the DOC. The DOC emphasized that 233 additional complaints of sexual abuse, harassment, and "over familiarization" had been raised between 2004 and 2009. Since the implementation of the 2009 BFOQs, less than 50 such complaints had been filed. The DOC described that the BFOQs were developed by a group of DOC administrators using the criteria set forth by the United States Court of Appeals for the Sixth Circuit in *Everson v Dep't of Corrections*, 391 F3d 737 (CA 6, 2004).

Nowacki, on other hand, contended that the DOC's arguments were red herrings. Nowacki asserted that the housing-unit BFOQs alone reduced the number of complaints, that the DOC pretextually added new strip-search and pat-down duties into job descriptions in nonhousing positions, and that prisoners were never in a state of undress in the food-service, classrooms, gym, or other nonhousing units. Nowacki further argued that *Everson* was inapplicable as its reasoning applied to housing-unit BFOQs. Most importantly, Nowacki insisted that the DOC was required to present the actual decisionmakers behind the 2009 BFOQs and yet could not identify them.

The circuit court denied both parties' motions, reasoning "that there are genuine issues of material fact regarding whether the BFOQs at issue violate the Elliott-Larsen Civil Rights Act." The DOC filed an interlocutory application for leave to appeal, but this Court denied it "for failure to persuade the Court of the need for immediate appellate review." *Nowacki v Dep't of Corrections*, unpublished order of the Court of Appeals, entered August 23, 2018 (Docket No. 342317).

Moving forward, Nowacki filed a motion in limine "to exclude after-the-fact justifications for BFOQs." Nowacki argued, "To justify gender classifications like the BFOQ female-only positions at issue here, the law requires proof of the *actual* decision-makers' justification." Relying on federal cases, Nowacki argued that the DOC could not cite "hypothesized or invented *post hoc*" justifications "in response to litigation." Nowacki complained that the individuals identified by the DOC "admitted that they played no role in developing the BFOQs" and the actual decisionmakers had not been identified. Accordingly, Nowacki sought exclusion of the testimony of several high-level DOC and WHV administrators. Without this evidence, Nowacki contended, "there is no question of fact on the issue."

The DOC complained that Nowacki's motion to preclude evidence was actually a renewed motion for summary disposition. The DOC further contended that the witnesses did not provide inadmissible after-the-fact justifications for the BFOQ classifications. Rather, the experienced witnesses described the day-to-day operation of a prison, the duties required in the challenged positions, and why the institution determined that the gender distinctions were required.

The DOC also filed its own motion in limine to preclude Nowacki from arguing that the DOC's 2016 abolishment of eight nonhousing-unit BFOQ classifications was evidence that the BFOQs were not supportable when adopted in 2009. The DOC further sought to prevent the admission of evidence that the United States Department of Justice (DOJ) had filed suit against the DOC on behalf of female COs at WHV.

The circuit court did not contemporaneously consider the parties' motions. Instead, the trial was adjourned several times and settlement attempted. The DOC renewed its motion to exclude evidence in 2021, while Nowacki raised his arguments anew in his trial brief. The court again did not resolve the parties' requests.

At trial, various COs at WHV, both male and female, described that male officers had been transferred to other positions as a result of the BFOQs and had lost overtime opportunities. These witnesses offered several reasons the BFOQs were unnecessary.

First, the witnesses claimed the DOC artificially inserted pat-down and strip-search requirements into job descriptions that had not previously included those duties. Even for positions that did require pat-downs, the witnesses asserted that male COs could fulfill the job requirements by requesting the assistance of a female CO or rover. This "team approach" had been used for years without incident and without noticeable delays, the witnesses testified. Moreover, strip searches were never conducted in any nonhousing unit. If a strip search was required, a CO would escort the prisoner to the designated strip-search area, which had always been staffed by female COs. Indeed, two COs testified that they had never seen a prisoner in a state of undress in many of the BFOQ positions.

Second, the witnesses contended that WHV had a state-of-the-art video and audio recording system with high resolution cameras covering almost every inch of the facility. These cameras made it nearly impossible to stumble into a secluded area or one-on-one situation with a prisoner. The witnesses asserted that this system was in place in 2009 and that there had been no "dramatic improvement in the cameras" between 2009 and 2016, when the DOC relied on the camera system to discontinue eight of the 11 nonhousing-unit BFOQs.

Third, Nowacki contended that the 2009 BFOQs were not supportable because the concerning misconduct had occurred at three since-shuttered facilities, not at WHV. Nowacki and another CO opined that there were no issues at WHV and "the facility operated just fine" between 2005 and 2011.

Fourth, the witnesses pointed to their training in avoiding one-on-one and secluded encounters with female prisoners. The witnesses insisted that the BFOQs were unnecessary because the COs were trained not to fall into situations in which they could be accused of sexual impropriety.

Finally, the witnesses testified that the BFOQs could not be supported because the DOC could not present testimony from individuals who were actually involved in the decision-making process.

The DOC presented the various settlements, judgments, and reports related to the prior lawsuits involving sexual misconduct at Michigan's women's prisons. The first settlement reached was in the United States District Court for the Eastern District of Michigan in *United States v State of Michigan*, Docket No. 97-CVB-71514-BDT. The May 25, 1999 settlement arose from a lawsuit filed on behalf of female prisoners, in part, based on a violation of their right "to be free from sexual misconduct and unlawful invasions of privacy. . . ." The DOC agreed to "revise its current policies and procedures relating to sexual misconduct, sexual harassment, overfamiliarity, and other concepts encompassed by this Settlement Agreement." One change was to prescreen employment candidates and use "reasonable measures to determine applicants' fitness to work in a female facility prior to hiring correctional staff for a women's facility." Increased staff training, prisoner education, and protections for prisoners reporting sexual abuse were promised. The settlement agreement continued:

A. <u>Minimization of One on One Situations.</u> []DOC will implement a new policy that restricts inmates and male staff from being alone in one-on-one situations together . . . in areas not clearly visible to inmates or other staff, with the following exceptions: emergencies, medical care, counseling, questioning during investigations, and reporting of confidential information.

B. <u>Minimization of Access to Secluded Areas.</u> []DOC has and will continue to take reasonable measures to eliminate access to secluded areas that are not necessary to the operation of [the women's prison].

C. <u>Monitoring/Protection For Secluded Areas.</u> []DOC has and will continue to increase the visibility and observability of secluded areas . . . to which inmates have access, including, but not limited to, retrofitting as necessary doors

-5-

with windows, screens, or other devices which will facilitate surveillance, installing convex mirrors to provide a line of sight beyond areas not viewable from front door windows or other observation points, and rekeying to further restrict access to secluded areas. []DOC will require that supervisors conduct rounds of such areas at periodic intervals sufficient to guard against sexual misconduct, sexual harassment, overfamiliarity or other conduct prohibited by policies establish pursuant to this Agreement.

* * *

H. <u>Staffing.</u> Within [90] days after execution of this Settlement Agreement, []DOC will conduct a staffing study to explore the feasibility of: 1) redeploying [COs] to increase the presence of female [COs] in the housing units at the [women's prisons]; and 2) rotating staff assignments to housing units at [the women's prisons]. If feasible, []DOC will develop and implement a plan consistent with this study.

New knock-and-announce procedures would be implemented in "areas where inmates normally could be in a state of undress." Relating to pat-down searches, the settlement agreement provided:

Absent exigent circumstances or a reasonable suspicion that the inmate is in possession of contraband, and subject to legitimate penological concerns, pat down searches of female inmates will only be conducted by female [COs] during an evaluation period of at least six months. During the evaluation period []DOC will (a) conduct training and make any needed policy revisions to further clarify that pat down searches are not used to sexually harass inmates, and (b) evaluate the feasibility of modifying or eliminating the current requirement of five daily pat down searches per [CO]. Should the []DOC decide to resume the routine search of inmates by male [COs], institutional management will routinely observe line staff conducting pat down searches and give instruction or guidance as needed.

In June 2000, an expert hired by the DOC, Michael J. Mahoney, presented a report "to determine whether certain custody positions at MDOC women's facilities should be filled only by female custody staff or if there is a less intrusive means to ensure the safety and reasonable privacy needs of female inmates." Mahoney considered the completed litigation in *United States v State of Michigan*, and the ongoing litigation in *Nunn v Mich Dep't of Corrections* and *Neal v Mich Dep't of Corrections*, which will be discussed below. Mahoney noted:

When allegations of inappropriate sexual behaviors are made against staff, the staff person identified is generally removed from their assignment and placed into a non-inmate contact assignment . . . and negatively labeled. Similarly, prisoners who make such allegations claim fear of retaliation by corrections staff. . . . Prisoners can suffer the consequences of disciplinary charges for allegations that are unfounded.

Mahoney outlined the changes already made by the DOC, such as reconfiguring showering, toilet, and dressing areas, and limiting access to areas without adequate visibility. Mahoney further

noted the change in pat-down procedures and knock-and-announce rules, new prescreening practices, staff training, and prisoner education.

Mahoney recommended:

There are legitimate penological reasons for having only women staff supervise female prisoners in limited situations. These include:

- o Same sex supervision would reduce the likelihood of sexual misconduct. In most correctional facilities, the majority of sexual misconduct activities and allegations involved male staff and female prisoners. Utilization of female supervision of female prisoners in limited but specific areas of vulnerability will reduce the likelihood of such incidents.

- o The reduction of the potential or fear of sexual misconduct will enhance the []DOC's ability to achieve the mission and essence of the [DOC].

- o Observation is the key to supervising prisoners. Male staff, in supervising housing units where women change clothes, shower and use the toilet facilities, are sometimes reluctant to discharge these responsibilities because of their natural aversion to observing such activities. If they act on this natural reluctance, it provides for less security. If they actively pursue these visual activities, then it creates the potential for problems.

- o Housing units are where the most long-term and isolated continuing contacts between staff and prisoners occur. [COs] working in housing units tend to be assigned there for longer periods of time and tend to be isolated during the evening and night work hours. These situations can provide opportunities for relationships between staff and prisoners which can lead to over-familiarity and sexual misconduct. Female only staff in female housing units would reduce the likelihood of such occurrences.

* * *

Additional employee concerns relevant to this issue include the reduction of the fear of male staff from retaliation by the filing of false complaints by female prisoners against them for pat-down searches, visual observations and other activities. The removal of male staff from these limited assignments reduces the probability of false claims by prisoners of sexual misconduct and the reassignment of staff pending the outcome of the investigation.

. . . Current policy pursuant to policy variance issued by the Director requires that only female staff members shall pat-down search female prisoners at the female facilities. More female staff available in the female facilities will result in more pat-down searches and better security.

Problems have been identified since the new policy on the moratorium of male pat-down searches of female prisoners have occurred. Instances of increased

-7-

levels of contraband, decrease in staff morale, and perceptions of a lessening of security have occurred.

Assuming the continuation of this pat-down policy, there should be an increase in female staff available to conduct them in a professional manner.

Ultimately, Mahoney concluded that female-only staff should be used in housing, segregation, and intake units.

*Nunn v Mich Dep't of Corrections* was a private lawsuit filed in 1996 by female prisoners in Michigan's women's prisons, alleging sexual abuse and sexual misconduct. The parties entered into a settlement agreement on July 31, 2000, requiring the DOC to "develop and maintain one policy which implements prohibitions against sexual misconduct, sexual harassment, and retaliation, and identifies the reporting and complaint mechanisms, the investigation procedures and discipline for sexual misconduct, sexual harassment, and retaliation." The settlement further required screening of job applicants and current employees, additional staff training, and prisoner education.

The *Nunn* settlement required the maintenance of "a written procedure that restricts male staff from being alone in one-on-one situations with prisoners at facilities and centers in areas not clearly visible to prisoners or other staff," and to "maintain reasonable measures to eliminate prisoner access to secluded areas that are not necessary to the operation of the facility or center." The DOC was required to institute "a tracking system to store allegations and information" about sexual misconduct claims, "whether substantiated or not." And "[a]bsent emergency circumstances or a reasonable suspicion that the prisoner is in possession of contraband, pat down searches of prisoners [would] only be conducted by female [COs] during an evaluation period of at least [12] months." The DOC was required "to limit the assignment of staff in facility housing units to female [COs]," and any male entering the area was directed to sign in and knock and announce his presence. "Except when a female [CO] is not available and immediate transport is deemed necessary, at least one female [CO] [would] be assigned to transport a prisoner." Further, "[o]n medical runs where it is probable the prisoner will be seen fully or partially nude, no male [CO] [could] remain in the examination room absent an emergency or a request from the examining physician." Additional stringent reporting, antiretaliation, investigation, discipline, and victim treatment duties were imposed on the DOC.

The United States Sixth Circuit Court of Appeals decision in *Everson v Dep't of Corrections*, 391 F3d 737, 739 (CA 6, 2004), was released on December 3, 2004, following a lawsuit filed by male and female COs challenging the creation of 250 female-only BFOQ positions in Michigan's women's prisons. These included all housing-unit positions, as well as nonhousing-unit intake and transportation officers. Intake officers were required to strip search new prisoners, as well as supervise them as they showered. Transportation officers took female prisoners to medical appointments and assisted restrained prisoners with toileting. *Id*. at 740. The Court described studies uncovering sexual abuse and misconduct against female prisoners in Michigan prisons by male staff. *Id*. at 741. The *Everson* Court continued by discussing the *Neal*, *Nunn*, and *United States* lawsuits, as well as an investigation by the DOJ, and the promises made by the DOC in connection with those disputes. *Id*. at 742-744. The Court discussed the 1998 creation of a Gender Specific Assignment Committee, which "recommended gender-specific assignments to

certain tasks, such as strip searches, pat-down searches, and urine collection." *Id*. at 744. That committee did not recommend female-only staffing in housing units, instead promoting the use of teams of female and male COs. *Id*. The Court outlined two expert studies commissioned by the DOC to further consider classifying positions as gender specific. *Id*. at 744-745.

The federal district court invalidated the BFOQs, finding that there were reasonable alternatives to the gender-based distinctions. *Id*. at 747. After outlining the standards for reviewing a BFOQ, *id*. at 747-749, the Court overruled the district court, concluding, "Though it did not exhaust its institutional resources, the []DOC made a considered decision that a BFOQ was necessary to address the grave problems of sexual abuse of female inmates." *Id*. at 751. The DOC made its decision only after commissioning several studies and negotiating several settlements. "Clearly, the []DOC's plan was the product of a reasoned decision-making process." *Id*. at 752 (quotation marks and citation omitted). The Court specifically cautioned against court interference limiting the DOC's "freedom to evolve and innovate." *Id*. at 752-753.

The *Everson* Court held, "[T]he exclusion of males from these positions is 'reasonably necessary' to 'the normal operation' of the []DOC's female facilities" as they "would materially advance a constellation of interests related to the 'essence' of the []DOC's business," specifically security, safety, and the protection of privacy rights. *Id*. at 753. Alternatives had been considered and were deemed inadequate to protect both the female prisoners and the male COs. *Id*. at 753-754.

The *Everson* Court also described the statistics that had been presented in the litigation. Somewhere between 39% and 57% of sexual misconduct arose in the housing units. *Id*. at 755. (Relevant to the current matter, 43% to 61% happened outside of the housing units.) The Court held that the DOC established that the exclusion of male COs from the housing units would "decrease the likelihood of sexual abuse." *Id*. Although no measure could completely eradicate risks, the DOC proved that this measure was necessary to make any headway. *Id*. at 756. The Sixth Circuit concluded that "given the endemic problem of sexual abuse in Michigan's female facilities, given the constellation of issues addressed by the MDOC's plan (security, safety, and privacy), and given the deference accorded the MDOC's judgment, the MDOC's plan is reasonably necessary to the normal operation of its female prisons." *Id*. at 761.

Several years later, an arbitration award entered following a grievance filed by the Michigan Corrections Organization against the DOC on October 3, 2006. The grievance was filed following the settlement in *United States v State of Michigan* and challenged the creation of female-only housing-unit BFOQs and restrictions on pat-down and strip searches. The DOC had recently expanded the limitations to other positions. Of particular interest were the connected "gate" and "bubble" positions. The DOC determined that at least one position must be filled by a female. As the bubble officer was then male, the gate position had to be filled by a female despite that no BFOQ had been approved. The arbitrator agreed that "the vast majority of positions" at the women's prison were "female only BFOQ's," leading to "limited opportunities for male COs to obtain regular or overtime assignments." The arbitrator found no legal impediment to designating the gate position as a female-only BFOQ position as well, but ruled that the warden had to go through the proper channels. In supporting this ruling, the arbitrator relied on the testimony of DOC officials that the "team approach" of pulling a female CO from another location to assist a male CO in a pat-down search "would be disruptive and impractical."

Finally, a settlement agreement was reached in the 1996 lawsuit filed in *Neal v Mich Dep't of Corrections* on July 15, 2009. This settlement paid out millions of dollars to several female prisoner class members in exchange for dismissal of their claims arising from sexual misconduct they faced while in Michigan's women's prisons. In relation to the class members' claims for equitable relief, the DOC

> believe[d] it has implemented policy and training changes to improve its investigations of grievances and complaints related to sexual assaults and sexual harassment by male []DOC staff against female prisoners over the course of several years, beginning in 2000. Most particularly, beginning in 2006, under this administration, [the DOC] made significant changes in the staffing of the housing units in female correctional facilities to specifically address and reduce sexual assaults and sexual harassment by male staff toward female prisoners.

The DOC agreed to implement additional protections, including informing complainants when investigations are completed, advising prisoners that assault claims may be filed with the police, establishing a retaliation review committee, forbidding the issuance of misconduct tickets for filing a complaint "which is not sustained, unless it is shown by a preponderance of the evidence that the complaint was intentionally false," providing counseling and psychological treatment for abuse victims, creating counseling groups, referring sexual abuse and harassment grievances to internal affairs, and appointing a staff member to review "the Prison Rape Elimination Act (PREA) Report and Recommended Standards for reducing rape and sexual misconduct in correctional facilities."

Lopez served as the DOC's lead witness. Although Lopez was not involved in drafting the 2009 BFOQs, his direct superior Gary Manns, was. Lopez was involved in many meetings leading up to the settlement agreements and judgments in the prior suits related to sexual abuse in the prison system and the housing-unit BFOQs, and he was tasked with communicating with the corrections officer union about these decisions. Lopez served on a committee in connection with a settlement with the DOJ. "The committee was to review assignments within the correctional facilities for feasibly making them gender specific and then evaluating the positive and negative impacts such . . . assignments would have on the work force."

With regard to the various settlement agreements and the BFOQs, Lopez asserted that the DOC had two goals: "to minimize the impact on the affected employees" and "the protection of female prisoners." Lopez summarized that the focus in the DOJ settlement was "observation by supervisors," but things got "stronger" in other matters. In the *Nunn* settlement, for example, pat-down searches of female prisoners by male COs was forbidden. During the *Nunn* negotiations, the DOC "talked about redeploying . . . female staff to housing units," "covering positions with female" COs, "additional recruitment for female [COs]," and additional training for staff at female prisons. The DOC commissioned an expert report by Michael Mahoney "to explore the feasibility of BFOQs." Lopez asserted that the 2009 BFOQs were recommended "in response to" litigation involving the DOJ and *Nunn*. The *Neal* settlement was not reached until after the BFOQs were submitted to the MCSC, but the negotiations in that action played a role as well. Lopez asserted that the DOC was also "guided by the [*Everson*] decision."

Lopez attended the arbitration hearings in the union grievance matter regarding the BFOQ for the "gate" position. Lopez noted that prisoners travel through these gates from a secure

perimeter to other units. Traffic of female prisoners is "on a continuous basis almost" at that position. And pat-down searches were required at each passing. Accordingly, the DOC determined that that gate must be staffed with a female CO. Lopez noted that the arbitrator determined that the "team approach" would not work, finding "repeatedly pulling female employees from other critical assignments to supplement the work, [']shakedowns['], . . . of a male gate employee would be disruptive and impractical."

Lopez drafted the 2009 letter from Manns to the MCSC seeking to implement the 11 challenged BFOQs. The letter "was drafted after discussions with the . . . correctional facility administration about the need for additional BFOQ positions to address the continuing complaints of sexual misconduct by male [COs] against female inmates." In drafting the letter, Lopez relied on discussions surrounding the *Neal* settlement, the DOJ and *Nunn* settlements, the *Everson* resolution, the Mahoney report, and a gender-based classification study.

Lopez further testified that the DOC had considered alternatives to imposing BFOQs. The DOC continually improved the surveillance system until it reached a point that most of the challenged BFOQs could be withdrawn. The DOC considered relying on the team approach to searches, but determined "it was disruptive, pulling females from other - - their work areas because you might have to close that position down or maybe get someone else from another area, you know, from a further away area to cover that position." The team approach was ultimately too expensive. The facilities also changed the configuration of the showers and toilet stalls to provide as much privacy as could be safely handled.

Before drafting Manns's 2016 letter requesting to discontinue eight BFOQs, Lopez visited WHV and observed the camera system. By that time, more than 1,000 additional cameras had been installed. The technology included "high capacity fiberoptic lines" and high-capacity storage so information could be saved for the protection of both the COs and the prisoners.

When asked on cross-examination to explain how the other case negotiations were used to support the BFOQs, Lopez testified:

> [W]e had numerous meetings with the facility correction administration, that's the administration that the facilities report up through. We had meetings with Warden Warren and facility administration administrators and *Neal* was brought up in those discussions saying that we're in the process of negotiating under [*Neal*] and we need to get these BFOQs.

> So it wasn't just [*Nunn*] or USA, [*Neal*] was brought into those because they were having - - which I wasn't involved with, but the individuals that were . . . meeting with me saying we're over here looking at potential settlement, and it's because of the claims by inmates under [*Neal*] that they were still being subject to sexual harassment, abuse, misconduct, privacy. So that was a consideration I guess I want to say.

Lopez denied that the DOC was attempting to remove all male COs from WHV. When asked, "Do you think it's fair to penalize male [COs] in 2009 for what unrelated people did in the 1990s," Lopez responded:

What I think is fair is to ensure the safety of the prison and the rights of the inmates, you know, to a certain degree, they are inmates, but any individual should be free from sexual harassment, sexual abuse, privacy issues, and sexual misconduct. And we tried to identify those individuals that did this and we did it to the best of our ability.

The DOC also presented the testimony of Edward Vallard, a 36-year employee of the department who retired as the physical plant division administrator. Vallard testified that the DOC began a multi-million-dollar project in 2009 to replace the "analog CCTV type cameras" located in the WHV facility. The images captured by this system were of lower resolution and the system had only 30 days of storage. The upgrade project lasted from 2009 through 2018. The goal was to achieve "as much coverage" as possible to "provide safety and security to prisoners [and] staff." Vallard testified that the COs in the building would certainly know that cameras were being installed, but would not necessarily have known that the system was not fully operational. By 2016, there were over 2,000 cameras installed at WHV.

Tonya Allen transferred to WHV as a captain in 2012. At the time of trial, she was the Assistant Deputy Warden at the facility. Allen testified that the goals of the DOC and the BFOQs were to protect both the prisoners and the staff. The BFOQs "prevented and eliminated the male staff and the female prisoner from being one on one" and "[t]he camera system allowed" the staff to "supervise and monitor where [they] weren't always physically able to be." Allen further described that during her tenure at WHV, the number, quality, and coverage of cameras increased, leading to the discontinuance of some BFOQs in 2016. Allen opined that there was a lack of reasonable alternatives to the BFOQss until the camera system was completed:

Q. Prior to the camera system being substantially completed in your view were there any practical or reasonable alternatives to the BFOQs in terms of fulfilling these objectives?

A. If there is, I don't know of one. I mean we had 2,200 prisoners. Our facility is almost two acres. As a captain and a shift supervisor, you know, just rounding to the different areas I have 150 staff, 12 supervisors. I means it's - - it's busy, it's ongoing. We can't be everywhere all the time, so I think it was a great tool for us, you know, to help monitor the cameras, record so we can, you known, go back and see if something happened or didn't happen so.

Q. How would you respond to the Plaintiffs' claim that the team approach would be a reasonable alternative to BFOQs before the camera system was substantially upgraded?

A. Well, you know, the female [COs] complained that the male [COs] are not doing enough as it is to be quite honest. Their assignments are the programming assignments, the yard assignments where they, you know, they can move about and they're not as restricted time wise whereas the female [CO] has to be on their assignment, in a specific place all of the time; so to have them further assist, I mean, we all work together as a team don't get me wrong but to have the female [CO] now do the male's job would be a big problem.

While Allen admitted that there was less overtime available for male COs following the BFOQs, Allen found it "ridiculous" to accuse the DOC of generating the BFOQs for that purpose. Allen conceded that she was not involved in creating the BFOQs, asserting that they were a collaboration between the DOC and MCSC. When pressed by Nowacki's attorney to explain why the BFOQs were created and continued despite a lack of more recent substantiated claims of abuse, Allen responded that "unsubstantiated" does not mean the abuse did not occur, only that it could not be proven.

DOC Assistant Deputy Director Shawn Brewer had moved up the ranks for 25 years, but worked at WHV for a period of time ending in 2020. Brewer described that based on the earlier lawsuits, the DOC determined that they should not have male COs conduct pat-down searches, or work in areas where they could potentially be isolated with a female prisoner or in areas where the female prisoners could be in a state of undress. Medical areas required female COs as the prisoners could be in a state of undress. Food services was an "extremely large" area with a danger of being secluded one-on-one with a prisoner. Further, the COs were required to pat down the prisoners working in that area upon their departure. The classrooms were often staffed with only one person, creating a danger of being alone with a prisoner. Electronic monitoring in the control center required a female CO as the video feeds could show an inmate in a state of undress. The property room was a small, confined space with the possibility of seclusion. That area had been moved, however, eliminating the dangers posed. The gate position required a female CO because full body searches could be required not only of female prisoners, but also of visitors and vendors.

According to Brewer, the main reason the nonhousing-unit BFOQs could be eliminated in 2016 was the improvement of the camera system:

> When I arrived at WHV I began sitting in on the construction meetings . . . .
>
> The goal when I go there was to enhance the quality of the cameras in this project to eliminate isolated or blind spot areas, so there was an extensive review of where cameras were placed and/or which way they were focused. A continual video evidence recording of the entire perimeter, entrances into doors or housing units and unique to WHV is like porter closets have cameras in them, stairwells have cameras in them, basements have cameras in them. And then audio. The male prisons do not have audio recording. The areas inside the housing units and inside the buildings of WHV have audio recording as well, which is totally different than the males. And then there was a need for a large increase of the retention system for that empirical evidence if you will. The system when it was first installed before I got to WHV was good as it was when it was installed we know that technology dates itself very quickly, so it became quite cumbersome to pull so this included a much larger and more centralized retention for that evidence.

Brewer asserted that the team approach was not a reasonable alternative to the BFOQs:

> [T]he thought of two persons working side by side seeing the same things and having the same interactions throughout an entire shift is impractical. Somebody has to have a meal; both of them can't go. Somebody could let a prisoner into an isolated area - - it's just not practical. And then the recruiting

-13-

element would add a huge financial burden to a facility's operating costs. It would double each of those identified assignments. It would go from one full-time employee to two and then when you consider the relief factors into the custodial assignment, it would be a very large financial impact for the operating procedures or costs.

Brewer also asserted that just because the prison did not have a log of substantiated abuse claims after 2004, did not mean abuse had not occurred or that the BFOQs were unnecessary. "They could report it through their family or through an outside advocacy group, to an outside attorney." In such cases, WHV would have no record.

At the end of the trial, Nowacki sought a directed verdict on the DOC's BFOQ affirmative defense. Nowacki summarized that the DOC was required to establish that "the BFOQs were reasonably necessary to the operation of the prison," that "the BFOQs were central to the mission of the" DOC, and that the DOC considered other alternatives. Nowacki contended that the DOC had produced no evidence to establish the DOC's motivation for creating the 2009 BFOQs. The circuit court denied Nowacki's motion.

Before trial, the DOC had requested that the court take judicial notice of certain facts ascertained in the earlier related proceedings. The court granted this request midway through the trial with revisions and over Nowacki's objections. As a result, the court instructed the jury as follows:

> In this case you must accept the fact that the Sixth Circuit Court of [A]ppeals approved the []DOC's implementation of [BFOQs] for use in the housing units at [WHV] due to privacy issues that exist with a female prisoner population. The court found that situations where a prisoner could be seen in a state of undress were such private situations that only female [COs] could fill such positions. A person subject to this article may apply to the [MCSC] for an exemption on the basis that religion, national origin, age, height, weight or sex is a [BFOQ] reasonably necessary to perform a normal operation of the business or enterprise. Upon sufficient showing the [MCSC] may grant an exemption to the appropriate section of this article. An employer may have a [BFOQ] on the basis of religion, national origin, sex, age or marital status, height and weight without obtaining prior exemption from the [MCSC] provided that an employer who does not . . . obtain an exemption shall have the burden of establishing that the qualification is . . . reasonably necessary to the normal operation of the business.

> Request number one, the BFOQs where female prisons housing unit were found to be reasonably necessary to the normal operation of []DOC's female facilities in [*Everson*] and in doing so the court recognized that the []DOC made a considered decision that a BFOQ was necessary ["]to address the grave problem of sexual abuse of female inmates" . . . .

> Number two, an arbitrator was satisfied that in light of the decision in [*Everson*,] female prisons could be within the scope of allowable overtime . . . assignment practices when making female only . . . "overtime assignments" . . . to

non-bid . . . "gate positions" . . . . And would also support a facility practice of making overtime assignments on women only to the BFOQs within the facility in the Michigan corrections organization and [DOC] grievance number 2112805.

Number three, that on May 25th of 1999 []DOC entered into a settlement agreement with the [DOJ] regarding sexual misconduct and unlawful invasions of privacy in women's prisons, [*United States v State of Michigan*], US District Court, Eastern District case 97-CVB-71514-BDT. The terms of this settlement agreement imposed certain restrictions on staffing . . . at Defendant's women's prisons.

Number four, on July 31 of 2000 MDOC entered into a similar settlement agreement concerning women prisoners under jurisdiction of the []DOC and which further imposed restriction on a pat down search - - searches and prison staffing issues during the agreed evaluation monitoring period. [*Nunn.*]

Number five, in 2009 MDOC entered into a settlement agreement which also addressed MDOC's significant changes in staffing of the housing units in female correctional facilities to specifically address issues to reduce sexual assault and sexual harassment by male staff toward female prisoners. [*Neal,*] Washtenaw County Case number 96-6986-CZ.

Number six, in March of 2009 Gary Manns administrator of the []DOC operations support administration sent letters . . . to the [MCSC] requesting and providing justifications for expanding the established . . . BFOQ positions that if approved . . . , "will result in the utilization of only female staff in positions with regular work assignments that affects the privacy and security of female prisoners."

Number seven, in April 2009 Jeremy Stevens, a state personnel director of the [MCSC] responded to Mr. Manns'[s] letter and determined that it was appropriate that only female employees be assigned to regular work assignments in these positions that affect the privacy and security of female prisoners including but not limited to observing showers, dressing, undressing, use of toilet facilities and conducting clothed and unclothed strip searches.

And Number eight on June 23, 2000 the []DOC provided the . . . Mahoney expert report, which made recommendations that there are legitimate penological reasons for having only women staff supervise female prisoners in the limited situations which the report identified.

The jury returned a verdict in the DOC's favor. Nowacki then filed a motion for judgment notwithstanding the verdict (JNOV). Nowacki again contended that to support the BFOQ affirmative defense, the DOC had to provide "the actual justifications relied upon by the decisionmaker(s) at the time the decision was made," and yet failed to do so. Nowacki asserted that the DOC "admitted it does not and cannot know what the decisionmaker's reasons were for designating the positions as BFOQs because it does not know who made the decision." The circuit court denied that motion as well.

Nowacki now appeals as of right on behalf of the class.

-15-

## II. RELEVANT LAW

"Title VII of the Civil Rights Act of 1964 broadly proscribes gender-based discrimination in the workplace." *Everson*, 391 F3d at 747. "Title VII permits overt discrimination if the disparate treatment is based on a bona fide occupation qualification, or BFOQ." *Id*. "The BFOQ defense countenances gender-based discrimination 'in those certain instances where . . . sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise.' " *Id*. at 747-748, quoting 42 USC § 2000e-2(e) (2001). The BFOQ defense is written narrowly and must "be read narrowly." *Everson*, 391 F3d at 748. See also *Int'l Union v Johnson Controls*, 499 US 187, 201; 111 S Ct 1196; 113 L Ed 2d 158 (1991).

The employer bears the burden of establishing a BFOQ defense. *Everson*, 391 F3d at 748. The employer must prove three elements: (1) that there is "a 'basis in fact' for its belief that gender discrimination is 'reasonably necessary'—not merely reasonable or convenient—to the normal operation of its business"; (2) that the challenged job qualification "relate[s] to the essence, or to the central mission, of the employer's business"; and (3) "that no reasonable alternatives exist to discrimination on the basis of sex." *Id*. at 748-749 (quotation marks and citations omitted). When faced with judicial review, "the reasoned decisions of prison officials are entitled to deference and . . . the goals of security, safety, privacy, and rehabilitation can justify gender-based assignments in female correctional facilities." *Id*. at 750.

As described by the United States Supreme Court:

> The wording of the BFOQ defense contains several terms of restriction that indicate that the exception reaches only special situations. The statute thus limits the situations in which discrimination is permissible to "certain instances" where sex discrimination is "reasonably necessary" to the "normal operation" of the "particular" business. Each one of these terms—certain, normal, particular— prevents the use of general subjective standards and favors an objective, verifiable requirement. But the most telling term is "occupational"; this indicates that these objective, verifiable requirements must concern job-related skills and aptitudes. [*Int'l Union*, 499 US at 201.]

"In light of these demanding legal standards, BFOQs are few and far between." *Teamsters Local Union No 117 v Wash Dep't of Corrections*, 789 F3d 979, 987 (CA 9, 2015). As described by the United States Court of Appeals for the Ninth Circuit, "In many industries, it is difficult to imagine any jobs that would qualify as BFOQs. However, the unique context of prison employment is one area where courts have found sex-based classifications justified." *Id*. (quotation marks and citations omitted).

## III. ANALYSIS

On appeal, Nowacki accuses the DOC of hiding the identity and reasoning of the actual decisionmakers who advocated for and drafted the challenged BFOQs. Nowacki contends that the witnesses identified asserted that they were not involved in the meetings and decisions that led to the BFOQs at issue in this case. He also argues that the DOC cannot support the nonhousing BFOQs with the previous cases affirming female-only housing-unit positions in Michigan's

former female-only prisons, or the decisionmakers' reasoning in drafting the earlier housing-unit BFOQs.

## A. EVIDENTIARY SUPPORT FOR BFOQS

Nowacki has cited a variety of cases allegedly supporting his position that the DOC was required to present the actual decisionmakers to describe their motivations at the moment the BFOQs were adopted. Nowacki's interpretation of the holdings in these cases is inaccurate. In *United States v Virginia*, 518 US 515; 116 S Ct 2264; 135 L Ed 2d 735 (1996), the United States Supreme Court considered the state of Virginia's justifications for maintaining a state-sponsored all-male military academy and its attempt to create a separate-but-equal program in response to a court ruling against it. The Court reasoned:

> To summarize the Court's current directions or cases of official classification based on gender: Focusing on the differential treatment or denial of opportunity for which relief is sought, the reviewing court must determine whether the proffered justification is exceedingly persuasive. The burden of justification is demanding and it rests entirely on the State. The State must show at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives. The justification must be genuine, not hypothesized or invented post hoc in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females. [*Id*. at 532-533 (cleaned up).]

In *Haight v Thompson*, 763 F3d 554 (CA 6, 2014), the United States Court of Appeals for the Sixth Circuit considered whether a Michigan prison violated a Native American prisoner's religious rights in refusing a request for a sweat lodge. In that case, "[t]he prison officials add[ed] several after-the-fact explanations for denying" the request. *Id*. at 562. "[E]xplanations offered for the first time in litigation ought to come with a truth-in-litigating label, requiring the official to disclose whether the new explanations motivated the prison officials at the time of decision or whether they amount to post hoc rationalizations." *Id*.

In *Communities for Equality v Mich High Sch Athletic Assoc*, 178 F Supp 2d 805 (WD Mich, 2001), a federal district court considered the differential (and detrimental) treatment of girls' sports seasons. The court noted:

> The empirical evidence was wholly insufficient. The MHSSA chose to rely on anecdotal and weak circumstantial evidence instead, which is not enough. . . . Moreover, the logistics justification smacks of post hoc rationalization for a system that only in the relatively recent past decided that girls were entitled to play sports and must be treated fairly in athletics. [*Id*. at 851.]

None of these cases require the employer to present the actual decisionmaker to testify about his or her motivations while drafting a BFOQ. In this case, the DOC did initially, and incorrectly, assert that the WHV warden in 2009 and certain other officials were involved in the decision-making. However, the DOC did present significant evidence regarding the decision-

making process and a high-level administrator, Tony Lopez, who could lay out the history. The DOC's policies evolved over two decades as the department navigated through a maze of litigation and grievances. Committees were formed, studies undertaken, and settlements negotiated. The DOC consolidated its three women's prisons into one and a line of administrators made decisions to improve conditions for both prisoners and staff. This history was the decision-making process. The reasons cited by the DOC were not imagined, after-the-fact justifications.

## B. JUDICIAL NOTICE

Nowacki further contends that the circuit court erred in taking judicial notice of "facts," i.e. the prior lawsuits, settlements, arbitrations, and studies, related to previously designated BFOQs. As a reminder, the circuit court instructed the jury that (1) the *Everson* Court held that the housing-unit BFOQs were legally valid; (2) an arbitrator in a union grievance matter relied on *Everson* to uphold the classification of the gate position and overtime assignments as female only; (3) the DOC entered a settlement agreement with the DOJ that imposed staffing restrictions in women's prisons; (4) the DOC entered a settlement in the *Nunn* case that imposed further staffing and pat-down restrictions; (5) the DOC entered a settlement agreement in the *Neal* case, addressing "significant changes in staffing of the housing units"; (6) in 2009, Manns submitted a request to the MCSC to expand the BFOQs to certain nonhousing-unit positions; (7) a month later, the MCSC approved Manns's request; and (8) the Mahoney report recommended that only female COs supervise female prisoners in certain situations identified in the report.

"Judicial notice is discretionary and we review for an abuse of that discretion a trial court's decision whether to take judicial notice." *Lenawee Co v Wagley*, 301 Mich App 134, 149; 836 NW2d 193 (2013) (citations omitted). MRE 201(a) grants trial courts the discretion to take judicial notice of "adjudicative facts." "Adjudicative facts" are "facts about the particular event which gave rise to the lawsuit and . . . help[] explain who did what, when, where, how, and with what motive and intent." 2 McCormick, Evidence (8th ed), § 328, pp 640-641. "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." MRE 201(b).[1] See also

---

[1] MRE 202 provides for judicial notice of law as follows:

(a) When discretionary. A court may take judicial notice without request by a party of (1) the common law, constitutions, and public statutes in force in every state, territory, and jurisdiction of the United States; (2) private acts and resolutions of the Congress of the United States and of the Legislature of Michigan, and ordinances and regulations of governmental subdivisions or agencies of Michigan; and (3) the laws of foreign countries.

(b) When conditionally mandatory. A court shall take judicial notice of each matter specified in paragraph (a) of this rule if a party requests it and (1) furnishes the court sufficient information to enable it properly to comply with the request and (2) has given each adverse party such notice as the court may require to enable the adverse party to prepare to meet the request.

McCormick, p 641 ("Further, either because they were facts so commonly known in the jurisdiction or so manifestly capable of accurate verification, they were facts reasonably informed people in the community would regard as propositions not reasonably subject to dispute.").

Nowacki contends that the judicially noticed facts were actually conclusions of law and the court and defense improperly used them for collateral estoppel purposes. "Collateral estoppel precludes relitigation of an issue in a subsequent, different cause of action between the same parties when the prior proceeding culminated in a valid final judgment and the issue was actually and necessarily determined in that prior proceeding." *Rental Props Owners Ass'n v Kent Co Treasurer*, 308 Mich App 498, 528; 866 NW2d 817 (2014). The arbitration award followed a union grievance, not a legal action. And the letters and expert report simply are not judgments. Accordingly, Nowacki's challenge is misplaced in this regard.

For the doctrine of collateral estoppel to apply, both parties in the current action must have "had a full and fair opportunity to litigate the issue" in the prior action. *Id*. None of the plaintiff class members were involved in the DOJ, *Everson*, *Neal*, or *Nunn* lawsuits. Accordingly, if collateral estoppel were truly implicated in this case, it would preclude the admission of certain evidence. But that is not what occurred. The circuit court did not instruct the jury that it was bound by prior judgments and settlements. The court simply reiterated that the DOC had been involved in many legal actions related to the sexual impropriety that had occurred in its women's prisons that resulted in the DOC creating the earlier housing-unit BFOQs. Significant evidence was admitted at trial to support those facts, including copies of the settlement agreements and judgments. It was up to the jury to decide whether and how those historical facts played a role in the DOC's development of the 11 challenged BFOQs.

Nowacki further contends that the judicially noticed facts were irrelevant to the current action. "Relevant evidence is evidence 'having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " *Hardrick v Auto Club Ins Ass'n*, 294 Mich App 651, 667; 819 NW2d 28 (2011), quoting MRE 401 (emphasis omitted). The DOC established the relevance of the judicially noticed facts: they were integral to its decision to expand the BFOQs to the challenged nonhousing-unit positions. The history of litigation and the studies commissioned by the DOC established a roadmap for the DOC's reasoning and actions.

Nowacki asserts that the "facts noticed run afoul of MRE 403." MRE 403 precludes the admission of otherwise relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Citing *Blakely v City of Clarksville*, 244 Fed Appx 681 (CA 6, 2007), Nowacki contends that after hearing the circuit court take judicial notice of the prior lawsuit resolutions, the jury was likely to be misled into giving those judgments and settlements "more weight than [they] warrant[]." Unlike in *Blakely*, evidence regarding the prior lawsuits was not presented to convince the current jury to reach a similar conclusion as a prior jury. Indeed, there were no prior jury verdicts. The purpose of the evidence was to provide the historical background against which the DOC created the challenged BFOQs. This was not overly prejudicial. Nowacki has not demonstrated that the circuit court abused its discretion.

C. MERITS OF THE ACTION

Moreover, the DOC met its burden of establishing a basis in fact for believing it was reasonably necessary to the normal operation of the prison to designate the 11 challenged positions as female-only. As noted in *Everson*, only a portion of the sexual misconduct allegations arose within the housing units. A large number—43% to 61%—arose outside the housing units. See *Everson*, 391 F3d at 755. Although the number of reports made to prison officials had gone down by 2009, the DOC understood that not all allegations were captured by their reporting system. Likely fearing retribution or discipline, many victims over the years had lodged their complaints through family members, to outside advocacy groups, or waited until they were released to contact the police. Moreover, Mahoney reported that "the majority of sexual misconduct activities and allegations involved male staff and female prisoners." Accordingly, the DOC had a basis in fact to believe that employing female COs in female prisons would reduce the number of sexual misconduct allegations.

The DOC also met its burden of establishing that making the 11 challenged positions female-only related to its central mission. Manns's 2009 letter requesting approval of the BFOQs described the DOC's mission as "provid[ing] a safe and secure environment, while respecting the privacy of prisoners, and to provide staffing which is consistent with" federal and state equal employment laws. The *Everson* Court described the mission of the DOC as security, safety, and the protection of privacy rights. *Everson*, 391 F3d at 753. And Lopez asserted that the DOC had two goals: "to minimize the impact on the affected employees" and "the protection of female prisoners." Requiring female COs to monitor female prisoners in positions that require pat-down searches or where the officer might be alone or secluded with a prisoner meets those goals.

And the DOC went to great lengths to consider other options before deeming them unreasonable solutions. Contrary to Nowacki's assertions, there is no evidence that the DOC suddenly and artificially inserted pat-down requirements into the BFOQ descriptions. Even the class's own witnesses admitted that pat-down searches were required in the posts; they simply contended that the pat-downs could be accomplished by summoning a female CO from another location. This team approach was considered and rejected as a reasonable alternative. WHV was already short staffed and calling a female CO away from her post left other positions unstaffed. It was not cost effective to pair each male CO with a female to provide the necessary coverage.

The DOC had taken many steps to reduce the risk of sexual misconduct in response to the years of previous litigation. The DOC had reconfigured certain areas to ensure prisoners' privacy, secured secluded areas, and added convex mirrors to reflect blind spots. Most importantly, in 2009, the DOC began installing a sophisticated video recording system with high resolution imaging, clear audio recording, and massive amounts of storage. By 2016, the DOC had the system fully functional and had adjusted the components to ensure the greatest possible coverage. It was not until 2016 that this system was a reasonable alternative to the BFOQs. When that goal was met, the DOC withdrew eight of the 11 2009 BFOQs. This was not evidence that the BFOQs were unnecessary as posited by Nowacki, but rather demonstrated the DOC's successful drive to protect female prisoners while also ensuring equal employment opportunities.

There simply is no evidence that the DOC was driven by any animus toward its male employees or that it was trying to limit their opportunities. The DOC's goals were to protect its

female prisoners after a long-ignored history of sexual abuse at the hands of their jailers, but also to protect male COs from false claims of abuse. The DOC briefly classified eight positions as requiring a female CO and removed that classification once technology permitted another type of protection.

We affirm.

/s/ Elizabeth L. Gleicher
/s/ Kathleen Jansen
/s/ Michelle M. Rick